## COMMONWEALTH OF KENTUCKY v. POWERS.

### (Circuit Court, E. D. Kentucky. July 7, 1905.)

1. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—DISCRIMINATION IN SELECTION OF JURY IN CRIMINAL CASE.

    A person charged with crime in a state court has the right to be tried by a jury selected from persons possessing the statutory qualifications of jurors, without discrimination against those who belong to the same political class as himself because they belong to such class; and such right is one secured to him by the clause of the fourteenth amendment of the federal Constitution prohibiting a state from denying to any person within its jurisdiction the equal protection of the laws.

2. REMOVAL OF CAUSES—MOTION TO REMAND—ISSUES OF FACT.

    Distinct and unambiguous allegations of fact in a petition for removal, not denied by any pleading filed by plaintiff, except in so far as contradicted by the record, are to be taken as true, on a motion to remand, or other proceeding challenging the jurisdiction of the federal court.

3. SAME—DENIAL OF CIVIL RIGHTS—ACTS OF STATE.

    Rev. St. § 641 [U. S. Comp. St. 1901, p. 520], which provides for the removal of any civil suit or criminal prosecution against any person who is denied or cannot enforce in the judicial tribunals of the state any right secured to him by any law providing for equal civil rights, while not as broad as the provision of the fourteenth constitutional amendment for the equal protection of the laws, since it is confined to the action of judicial tribunals, is not restricted to cases where civil rights are denied by legislative action of the state, but applies as well where by rulings in other cases, or in the same case prior to final hearing, a rule of judicial decision has been established which will presumably so affect the judicial tribunals of the state as to cause a denial of civil rights to a defendant, or prevent their enforcement.

4. SAME.

    The right of removal under Rev. St. § 641 [U. S. Comp. St. 1901, p. 520], given to a defendant who is denied or cannot enforce his civil rights in the judicial tribunals of the state, is not affected by the fact that such rights may be enforced ultimately by proceedings in error in the Supreme Court of the United States. The remedy by removal is given by the statute to all who bring themselves within its provisions.

5. SAME.

    A petition for removal filed by a defendant in a criminal prosecution, taken in connection with the transcript filed in the federal court, showed that petitioner had been tried three times on the charge in a circuit court of Kentucky, and that each time he had been convicted, and the judgment reversed by the state Court of Appeals; that the crime charged grew out of a political contest; that, on the second and third trials, petitioner had been discriminated against in the selection of the jurors by those charged under the state law with the duty of drawing the panel and summoning veniremen, with the result that all the jurors by whom he was tried were in each case members of the opposite political party to himself; that, on objections properly taken to the panel and jury on that ground, and on motions for new trial, the court refused to consider evidence offered to prove such discrimination, and ruled that the petitioner had no right to object thereto, inasmuch as the jurors chosen possessed the statutory qualifications. By Ky. Code Cr. Prac. § 281, as construed by the Court of Appeals, such rulings of a trial court with respect to juries are made final, and are not subject to review. Held, that by such discrimination petitioner was denied the equal protection of the laws secured to him by the fourteenth amendment to the federal Constitution, and that the petition showed a right of removal under Rev. St. § 641 [U. S. Comp. St. 1901, p. 520], providing for such removal by any person who is denied or cannot enforce in the judicial tribunals of the state any right secured to him by any law providing for equal civil rights.

On Motion for Writ of Habeas Corpus Cum Causa.

R. B. Franklin, C. J. Bronston, N. B. Hays, and Lawrence Maxwell, Jr., for the Commonwealth.

R. D. Hill, Richard Yates, Frank S. Black, J. C. Sims, H. C. Howard, and R. C. Kinkead, for defendant.

COCHRAN, District Judge. This is a criminal prosecution by the commonwealth of Kentucky against Caleb Powers for the offense of having been an accessory before the fact to the willful murder of William Goebel, assassinated January 30, 1900, at Frankfort, Franklin county, within the Eastern District of Kentucky, which prosecution was begun and for some time has been pending in the courts of said commonwealth, but which said defendant, Powers, claims has been removed to this court by appropriate proceedings. It is before me now on his motion for the issuance of a habeas corpus cum causa to take him from the commonwealth's custody, where he has been since two days after the beginning of the prosecution, and place him in that of the United States, to await further proceedings therein in this court. The commonwealth of Kentucky, by its Attorney General and employed counsel, objects to this motion. The ground of its objection is that jurisdiction of the prosecution has not been removed from the state court to this court by said removal proceedings. It is in effect a motion to remand.

The statute under which said proceedings were had is section 641, Rev. St. U. S. [U. S. Comp. St. 1901, p. 520]. This statute originated in section 3 of the original civil rights act of April 9, 1866 (14 Stat. 27, c. 31), was re-enacted in section 18 of the act of May 31, 1870 (16 Stat. 144, c. 114), re-enacting said civil rights act after the adoption of the fourteenth amendment, July 21, 1868, and was carried from thence into the revision of 1873–74 as section 641 thereof. By section 5 of the jurisdictional acts of March 3, 1887 (24 Stat. 555, c. 373), and August 13, 1888 (25 Stat. 436, c. 866 [U. S. Comp. St. 1901, p. 515]), it was provided that nothing in said acts should be held, deemed, or construed to repeal or affect any jurisdiction or right mentioned in said section 641; section 642, providing for the issuance of the writ of habeas corpus cum causa sought herein; section 643, providing for removal of civil suits and criminal prosecutions in a different state of case than that provided in section 641, to which reference will be made further on, and other statutes not necessary to be referred to here. That portion of section 641 material to quote is as follows:

"When any civil suit or criminal prosecution is commenced in any state court, for any cause whatever, against any person who is denied or cannot enforce in the judicial tribunals of the state or in the part of the state where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States * * * such suit or prosecution may, upon the petition of such defendant filed in said state court at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be removed for trial into the next Circuit Court to be held in the district where it is pending. Upon the filing of such petition all further proceedings in the state courts shall cease and shall not be resumed except as hereinafter provided."

The remaining portion of the section provides for filing the transcript of the record in the state court in the Circuit Court of the United States, and for docketing the cause therein. Before stating the proceedings which have been had under said section, and considering their effect upon the jurisdiction of said prosecution, it will be well to do two things. One is to realize the constitutionality of said section, and to come to an understanding as to the basis thereof. This understanding will aid in its construction when we come to take that matter up. Its constitutionality was directly upheld in the case of Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664, and assumed in the case of Virginia v. Rives, 100 U. S. 313, 25 L. Ed. 667, decided the same day, and in the cases of Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567; Bush v. Kentucky, 107 U. S. 110, 1 Sup. Ct. 625, 27 L. Ed. 354; Gibson v. Mississippi, 162 U. S. 565, 16 Sup. Ct. 904, 40 L. Ed. 1075; Smith v. Mississippi, 162 U. S. 592, 16 Sup. Ct. 900, 40 L. Ed. 1082; Murray v. Louisiana, 163 U. S. 101, 16 Sup. Ct. 990, 41 L. Ed. 87; Williams v. Mississippi, 170 U. S. 213, 18 Sup. Ct. 583, 42 L. Ed. 1012—decided subsequently. Its peculiarity, causing one to want to understand as to its constitutionality, if not to question it, consists in the fact that it provides for the removal of a state prosecution for a state offense pending in a state court to a federal court. Section 643, heretofore referred to, is like it in this particular. It, too, provides for the removal of a state prosecution for a state offense pending in a state court to the federal court, but in a different state of case from that provided in section 641. That state of case is when the prosecution is against "any officer appointed under or acting by authority of any revenue law of the United States * * * or against any person acting under or by the authority of any such officer on account of any act done under color of his office or of any such law or on account of any right, title or authority claimed by such officer or other person under any such law," etc. This statute originated, about the same time as that contained in section 641, in section 67 of the act of July 13, 1866 (14 Stat. 171, c. 184), and was carried from thence into the revision of 1873–74 as section 643. On the same day that section 641 was held to be constitutional, to wit, in the case of Strauder v. West Virginia, supra, section 643 was held to be constitutional, also, in the case of Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648. That day was March 1, 1880. It may be said to have been a great day in the history of federal jurisprudence. On the same day, section 4 of the act of March 1, 1875 (18 Stat. 336, c. 114 [U. S. Comp. St. 1901, p. 1261]), making it an offense against the United States, punishable in its courts, for a state officer or other person charged with any duty in the selection or summoning of jurors in state courts to exclude or fail to summon any citizen possessing all other qualifications prescribed by law on account of race, color, or previous condition of servitude, was held to be constitutional in the case of Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676. At the same time section 641 was construed not only in Strauder v. West Virginia, supra, but also in Virginia v. Rives, supra. A vigorous attack was made in

said four cases thus disposed of on the same day upon the constitutionality of said sections 641 and 643 and section 4 of the act of March 1, 1875, by Justices Field and Clifford, and they dissented from the conclusion of the majority of the court as to the constitutionality of each statute. Justice Clifford wrote the dissenting opinion in Tennessee v. Davis, and Justice Field that in Ex parte Virginia. Their views as to the constitutionality of section 641 were embodied in a separate opinion by Justice Field in Virginia v. Rives, in which concurrence was expressed with the opinion of the majority of the court in that case as to the construction of section 641, and its applicability to a case of that kind. The ground of their attack upon all three statutes was, in substance, that they were an invasion of the sphere of state action, there being nothing in the federal Constitution to warrant them. In the case of Ex parte Virginia, Justice Field, in referring to the criminal prosecution of a state officer in a federal court under section 4 of the act of March 1, 1875, said:

"The proceeding is a gross offense to the state. It is an attack upon her sovereignty in matters over which she has never surrendered her jurisdiction. The doctrine which sustains it, carried to its logical results, would degrade and sink her to the level of a local municipal corporation."

In the case of Tennessee v. Davis, Justice Clifford said:

"Viewed in any light, the proposition to remove a state indictment for felony from a state court having jurisdiction of the case into the Circuit Court, where it is substantially admitted that the prisoner cannot be tried until Congress shall enact some mode of procedure, approaches so near to what seems to me both absurd and ridiculous that I fear I shall never be able to comprehend the practical wisdom which it doubtless contains."

Both judges had much to say as to the mode of procedure in the federal courts after the removal thereto of a criminal prosecution pending in the state court under either section 641 or 643. Justice Field, in Virginia v. Rives, said:

"There are many other difficulties in maintaining the position of the Circuit Court, which the counsel of the accused and the Attorney General have earnestly defended. If a criminal prosecution of an offender against the laws of a state can be transferred to a federal court, what officer is to prosecute the case? Is the attorney of the commonwealth to follow the case from his county, or will the United States district attorney take charge of it? Who is to summon the witnesses and provide for their fees? In whose name is judgment to be pronounced? If the accused is convicted and ordered to be imprisoned, who is to enforce the sentence? If he is deemed worthy of executive clemency, who is to exercise it—the Governor of the state, or the President of the United States? Can the President pardon for an offense against the state? Can the Governor release from the judgment of a federal court? These and other questions which might be asked show, as justly observed by the counsel of Virginia, the incongruity and absurdity of the attempted proceeding."

The necessity of Congress having to enact some mode of procedure in such a case after its removal, before the prosecution could be tried, seems not to have been admitted, as Justice Clifford thought. Concerning this matter, Justice Strong, who delivered the opinion on behalf of the court in all four cases, in the case of Tennessee v. Davis, said:

"The imaginary difficulties and incongruities supposed to be in the way of trying in the Circuit Court an indictment for an alleged offense against the peace and dignity of a state, if they were real, would be for the consideration of Congress. But they are unreal. While it is true there is neither in section 643, nor in the act of which it is a re-enactment, any mode of procedure in the trial of a removed case prescribed, except that it is ordered the cause when removed shall proceed as a cause originally commenced in that court, yet the mode of trial is sufficiently obvious. The Circuit Courts of the United States have all the appliances which are needed for the trial of any criminal case. They adopt and apply the laws of the state in civil cases, and there is no more difficulty in administering the state's criminal law. They are not foreign courts. The Constitution has made them courts within the states to administer the laws of the states in certain cases, and, so long as they keep within the jurisdiction assigned to them, their general powers are adequate to the trial of any case. The supposed anomaly of prosecuting offenders against the peace and dignity of a state in tribunals of the general government grows entirely out of the division of powers between that government and the government of a state; that is, divisions of sovereignty over certain matters. When this is understood—and it is time it should be—it will not appear strange that, even in cases of criminal prosecution for alleged offenses against a state, in which arises a defense under United States law, the general government should take cognizance of the case, and try it in its own courts according to its own forms of proceeding."

The warrant found by the majority of the court in the federal Constitution for section 643 was the second section of article 3 and the eighth section of article 1 thereof. By the former it is provided that the judicial power of the federal government shall extend to all cases in law and equity arising under the Constitution and laws of the United States, and treaties made under their authority. By the latter it is provided that Congress shall have power to make all laws necessary and proper for carrying into execution all the powers vested by the Constitution in the government of the United States, or in any department or officer thereof. It was held that a state prosecution for a state offense pending in a state court, in which the defendant claims that the act for which he is being prosecuted was done under the color of his office as a federal official, was a case arising under the Constitution and laws of the United States, to which the judicial power thereof extended, and that a law providing for the removal of such prosecution to the federal court was proper for carrying into execution such power. The warrant so found for sections 641 and 642 and section 4 of the act of March 1, 1875, was the fourteenth amendment to the federal Constitution, and particularly that part thereof contained in the last clause of the first section thereof, providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws," and in the fifth section thereof, providing that "the Congress shall have power to enforce by appropriate legislation the provisions of this article." Said last clause of the first section, though in form a prohibition simply against state action amounting to a denial to any person within its jurisdiction of the equal protection of its laws, conferred a right on such a person to the equal protection of the laws, which he was entitled to enforce. In the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, Justice Matthews said that it was "a pledge of the equal protection of the laws." In the case of Strauder v. West Virginia,

supra, Justice Strong said, "The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity or right."   And in the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835, Justice Bradley said:

"Positive rights and privileges are undoubtedly secured by the fourteenth amendment, but they are secured by way of prohibition against state laws and state proceedings affecting those rights and privileges, and by power given to Congress to legislate for the purpose of carrying such prohibition into effect."

As to the protection afforded by said clause of the amendment, Justice Field had this to say in the case of Santa Clara v. So. Pac. R. Co. (C. C.) 18 Fed. 398:

"This protection attends every one everywhere, whatever be his position in society or his association with others—either for profit, improvement, or pleasure.   It does not leave him because of any social or official position which he may hold, or because he may belong to a political body or to a religious society, or be a member of a commercial, manufacturing, or transportation company.   It is the shield which the arm of our blessed government holds at all times over every man, woman, and child in all the broad domain, wherever they may go, and in whatever relation they may be placed."

Said sections 641 and 642 enforce said last clause of the first section, in that they provide that if, in a civil or criminal prosecution pending in a state court, the defendant therein is denied or cannot enforce therein any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof—by which is meant said clause or any statute so providing passed pursuant thereto—he shall be entitled to have the suit or prosecution removed to the federal court. Said section 4 of the act of March 1, 1875, enforces said clause, in that it provides for the indictment and conviction in a federal court of any state official charged with the duty of selecting or summoning jurors who discriminates against him because of his color, and to this extent denies him the right to the equal protection of the laws pledged by said clause.

So much, then, as to the constitutionality of section 641, and as to the basis thereof.

The other thing which it will be well to do before stating the proceedings had under said section, and considering their effect upon the jurisdiction of the prosecution, is to give an outline of the proceedings had in the state courts before and up to the beginning of said removal proceedings, and thus fit the two together.   March 9, 1900, said prosecution was begun by the issuance of a warrant for defendant's arrest by the county judge of Franklin county. March 11, 1900, defendant was arrested under said warrant.   March 27, 1900, after an examining trial had before said county judge, he was held without bail to the grand jury of said county, at the then next April term of the circuit court thereof.   April 17, 1900, an indictment found by said grand jury was returned into court.   May 2, 1900, the prosecution was transferred to the circuit court of Scott county—an adjoining county to Franklin, and in the same judicial district, and within said Eastern District of Kentucky—on defendant's motion for a change of venue.   Beginning July 9th, a spe-

cial term of the said Scott circuit court was held, at which defendant was tried, and found guilty by the jury, who fixed his punishment at imprisonment for life. The verdict was returned August 18, 1900, and judgment thereon was entered September 5, 1900. The jurors from whom said jury was impaneled came from Scott county, and said jury was composed entirely of Scott county jurors. March 28, 1901, the Court of Appeals of Kentucky reversed this judgment— the court standing four to three in favor of the reversal—and remanded the prosecution to the lower court for further proceedings consistent with the opinion then delivered. The grounds of reversal were errors of the lower court as to the admissibility of testimony and instructions to the jury. October 10, 1901, at the regular October term, 1901, of said court, a second trial of defendant was had, which terminated as the first trial. The verdict of the jury was returned October 26, 1901, and judgment thereon was entered the same day. The jurors from whom this jury was impaneled came partially from Scott county and partially from Bourbon county—an adjoining county to Scott, and in the same state judicial district—and said jury seems to have been composed of six jurors from Scott and six from Bourbon. December 3, 1902, the Court of Appeals reversed this judgment—the court standing four to three in favor of reversal—and remanded the prosecution to the lower court for proceedings consistent with the opinion then delivered. The grounds of reversal were the same as on the first appeal, and, in addition, the refusal of the judge of the lower court to vacate the bench at the second trial therein upon defendant's filing an affidavit, under section 968 of the Kentucky Statutes of 1903, to the effect that said judge would not give him a fair and impartial trial, and setting forth at large the facts upon which he based this claim. On the filing of the mandate of the Court of Appeals in the lower court, said judge refused to vacate the bench, and thereafter was required to do so by a writ of prohibition from the appellate court. Thereupon a special judge was appointed by the Governor to try the case at the next trial. Beginning August 3, 1903, a special term of the Scott circuit court was held, at which defendant was again tried and found guilty; but this time the jury fixed his punishment at death, instead of imprisonment for life, as had been done by the two former juries. The verdict was returned August 29, 1903, and judgment thereon was entered the same day. The jurors from whom this jury was impaneled came from Bourbon county, and said jury was composed entirely of Bourbon county jurors. December 6, 1904, the Court of Appeals reversed this judgment—the court standing four to three in favor of reversal—and remanded the prosecution to the lower court for proceedings consistent with the opinion then delivered. The grounds of reversal were the entering of the judgment upon the verdict of the jury the same day it was returned, in violation of a Code provision, when defendant was seeking more time for filing additional grounds for new trial, and improper conduct on the part of one of the employed counsel for the commonwealth in his argument to the jury. Theretofore a jury in the Frank-

lin circuit court had convicted James B. Howard, claimed to be the assassin of William Goebel, of his murder, and fixed his punishment at imprisonment for life.  Said counsel, in his argument to the jury, made this statement in regard to that verdict, to wit, "Howard was not hung, but eleven of the twelve jurors who tried him were in favor of hanging him, and one was for life imprisonment, and the eleven had to come to the one," which the lower court permitted to be made against defendant's objection.  The opinion delivered in the Court of Appeals on the three separate hearings therein may be found reported as follows, to wit:  Powers v. Com., 110 Ky. 386, 61 S. W. 735, 63 S. W. 976, 53 L. R. A. 245; Same v. Same, 114 Ky. 237, 70 S. W. 644, 1050, 71 S. W. 494; Same v. Same (Ky.) 83 S. W. 146.

The term of office of one of the judges of the Court of Appeals who concurred in the said judgments of reversal expired on the 1st day of January last, and he was succeeded by the judge of the Scott circuit court who presided at the first two trials; having been elected to said position at the regular November election in 1904. Upon his vacating the office of circuit judge, an appointment was made by the Governor to fill the vacancy until the November election in this year.  May 3, 1905, the third day of the May term, of said Scott circuit court, the mandate of the Court of Appeals, issued upon its last judgment of reversal, was filed in the Scott circuit court, and the prosecution was set for a fourth trial at a special term to begin the 10th of this month—three days hence—when a trial will be had in said court before the judge appointed to fill said vacancy, if jurisdiction of the prosecution remains in the state court.

It is now in order to state the proceedings had under section 641, and, after doing so, to consider the question whether their effect has been to work a transfer of jurisdiction.  Those proceedings were begun in the Scott circuit court May 3, 1905, immediately upon the filing of the mandate of the Court of Appeals, as hereinbefore stated. At that time defendant tendered to said court a petition for the removal of the prosecution from that court to this court, and moved that he be permitted to file the same.  Upon the objection of the commonwealth, said court refused to permit said petition to be filed. The next Circuit Court of the United States in this district held thereafter was the London term, which began May 8, 1905—five days after the tendering of the petition for removal to the state court.  On that day, upon defendant's motion, a partial transcript of the record in the state court—all that the clerk thereof was able to furnish in the meantime—was filed and the cause was docketed in said court.  The commonwealth objected to this action of the court, and, upon its being had, moved to set it aside, which motion was overruled.  Leave was then granted to the defendant until the 8th day of June thereafter to procure and file an additional transcript, which has been done within the time limited.  The motion for the writ of habeas corpus was made at the time of filing the partial transcript and docketing the cause, and after the filing

thereof, to wit, on June 8th, said motion was taken up, argued, and submitted.

We are now in position to confront the question raised by said motion for a writ of habeas corpus, to wit, whether the effect of said removal proceedings has been to work a transfer of jurisdiction. Three things are essential in order that they should have had that effect. The first thing is that it must appear that the defendant has a right which he is entitled to enforce. The second is that it must appear that such right is a right secured to him by a law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States; i. e., a right secured to him by the equal protection of the laws clause of the fourteenth amendment, or a statute passed pursuant thereto and the fifth section thereof. It is not sufficient that it be a right which he is entitled to enforce. It must be a right so secured to him. The third and last thing is that it must appear that the defendant is denied such right, or cannot enforce it, in the state courts having jurisdiction of the prosecution against him, within the meaning of section 641.

The petition for removal contains two paragraphs, in each of which defendant states a separate right which he claims he is entitled to enforce, is secured to him by said clause of the fourteenth amendment, and is denied him and cannot be enforced by him in the state courts in the prosecution therein against him. That stated in the first paragraph is the right to be released from further custody under the charge against him, because of a pardon for said offense issued to him March 10, 1900, the day after his arrest, by William S. Taylor, then claiming to be Governor of Kentucky. That stated in the second paragraph is a right to have the jurors from which the jury that is to try him is to be impaneled selected from persons possessing the statutory qualifications, without discriminating against those of them who belong to the same political class to which he belongs, to wit, Republicans, because of their belonging to such class.

I prefer to take up the right stated in the second paragraph first, and consider and determine whether defendant has any such right; whether, if he has, it is secured to him by said clause of the fourteenth amendment; and whether, if it is, it is denied him or cannot be enforced by him in the state courts in the prosecution against him. The first two questions go together, for it is not claimed that he has any such right, other than by virtue of said clause of the fourteenth amendment. It is to be noted that, if he has any such right, it is only in relation to state action. It is not in relation to individual action apart from state connection. Of course, it could not well be otherwise, for no one has anything to do with the selection of jurors but some person acting for and on behalf of the state. If it exists, however, it is a right in relation to state action through any of its agencies. Justice Field, in Ho Ah Kow v. Nunan, Fed. Cas. No. 6,546, said:

"This inhibition upon the state applies to all the instrumentalities and agencies employed in the administration of its government; to its executive, legislative, and judicial departments; and to the subordinate legislative bodies of counties and cities."

The right secured by said clause, when its language is departed from, is almost invariably, if not entirely, referred to as a right to have the state refrain from unjust or unreasonable discrimination. A state has a right to discriminate between persons within its jurisdiction, but such discrimination must be along just and reasonable lines. A discrimination that is without a just or reasonable basis is purely arbitrary. And as said by Justice Matthews in Yick Wo v. Hopkins, supra, the principles upon which the institutions of our government are supposed to rest "leave no room for the play and action of purely personal and arbitrary power." He said further therein as follows, to wit:

"Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

As a rule, at least, discrimination by a state between classes of persons within its jurisdiction is unjust and unreasonable. Justice Matthews, in the case last mentioned, in referring to the ordinance involved therein, which left the question as to who might carry on the laundry business in San Francisco in wooden buildings to the arbitrary consent of a board of supervisors, who, in administering it, refused consent to Chinese, said:

"The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted that no reason for it exists, except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified. The discrimination is therefore illegal, and the public administration which enforces it is a denial of the equal protection of the laws, and a violation of the fourteenth amendment of the Constitution."

In the case of Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, in referring to a discrimination by a state through legislative action, Justice Brown said:

"The question in each case is whether the Legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class."

In the case of Ho Ah Kow v. Nunan, supra, Justice Field, in referring to similar discrimination, said:

"But in our country hostile and discriminating legislation by a state against persons of any class, sect, creed, or nation, in whatever form it may be expressed, is forbidden by the fourteenth amendment."

And in the case of Gibson v. Mississippi, supra, Justice Harlan said:

"In the administration of criminal justice, no rule can be applied to one class which is not applicable to all other classes."

In the matter of selecting jurors, it is well settled that there may be a discrimination by the state between persons within its jurisdiction that is just and reasonable, and hence right, under the fourteenth amendment. Justice Strong alluded to such discrimination in Strauder v. West Virginia, supra, when he said:

"We do not say that, within the limits from which it is not excluded by the amendment, a state may not prescribe the qualifications of its jurors, and, in so doing, make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications. We do not believe the fourteenth amendment was ever intended to prohibit this. Looking at its history, it had no such purpose."

Beyond such discrimination, a class discrimination in the selection of jurors is unjust and unreasonable. In the cases heretofore cited, beginning with Strauder v. West Virginia, in which the constitutionality of section 641 was held or assumed, it was held or assumed that a discrimination in the selection of jurors against negroes, because of their color, was unjust and unreasonable, and hence in violation of the fourteenth amendment. No occasion has arisen heretofore to decide whether any other class discrimination in the selection of jurors was likewise unjust and unreasonable, and such a violation. But in the case of Strauder v. West Virginia, supra, Justice Strong said:

"If, in those states where the colored people constitute a majority of the entire population, a law should be enacted excluding all white men from jury service, thus denying to them the privileges of participating equally with the blacks in the administration of justice, we apprehend no one would be heard to claim that it would not be a denial to white men of the equal protection of the laws. Nor, if a law should be passed excluding all naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the amendment?"

Judge Barker, in his separate opinion rendered on the last hearing of this prosecution in the Court of Appeals (Powers v. Commonwealth [Ky.] 83 S. W. 149), sums up the position of the Supreme Court of the United States in this particular in these words:

"The Supreme Court of the United States, the final arbiter in all matters involving the federal Constitution, has uniformly held that the exclusion from juries, grand or petit, of persons belonging to a class, for the sole reason that they belonged to such class, is, as to a member of the excluded class being tried under a charge of crime, a deprivation of the equal protection of the laws. This question has generally arisen in cases involving the exclusion and trial of negroes. This might well be expected, in the confusion of adjusting the rights of this race from their former condition of slavery to that of citizens, under the thirteenth, fourteenth, and fifteenth amendments. But the application of the principle under discussion is not confined to the rights of negroes. It extends to every person, whatever his race, color, or political affiliation, if his legal rights have been denied solely because thereof."

There would seem, therefore, to be no room to question that the defendant has the right which he asserts in the second paragraph of his petition, to wit, to have the jurors from which the jury is to be impaneled that is to try him selected from persons possessing the statutory qualifications, without discrimination against those of them who are members of the same political class as defendant be-

cause of their belonging to such class, and that it is a right secured to him by the equal protection of the laws clause of the fourteenth amendment. The right which he thus has is a right against discrimination on that account. It is not a right to a mixed jury; i. e., to have on the jury members of the political class to which he belongs. On this point Justice Strong had this to say in Virginia v. Rives, supra:

"Nor did the refusal of the court and the counsel for the prosecution to allow a modification of the venire, by which one-third of the jury, or a portion of it, should be composed of persons of the petitioner's own race, amount to any denial of a right secured to them by any law providing for the equal civil rights of citizens of the United States. The privilege for which they moved, and which they also asked from the prosecution, was not a right given or secured to them or to any person by the law of the state, or by any act of Congress, or by the fourteenth amendment of the Constitution. It is a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color. But this is a different thing from the right which it is asserted was denied to the petitioners by the state court, viz., a right to have the jury composed in part of colored men. A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia or by any federal statute. It is not, therefore, guarantied by the fourteenth amendment, or within the purview of section 641."

The right against discrimination, therefore, is a constitutional right, and should be respected by every one who in an official way has to deal with it. It should not be disregarded for any reason— not even because of a sincere conviction of guilt on the part of the accused, and a fear that otherwise he will go unwhipped of justice. The conception of a jury selected without class discrimination is a narrower conception than that of a fair and impartial jury. It is, however, an essential element in the conception of a fair and impartial jury. There cannot be a fair and impartial jury where there has been class discrimination. Just how far the fairness and impartiality of the jury will be affected by such discrimination depends on circumstances. In some circumstances it will be affected more than in others. But it is hard to conceive of a case where it will be more affected than in a case where there has been discrimination against the political class to which the defendant belongs, and the case has a political bearing, and has awakened great political feeling. Judge Barker, in the dissenting opinion heretofore referred to, truly said:

"I do not insist that in ordinary criminal trials there is any necessity for watchfulness to keep politics out of the jury box. When, ordinarily, one is arraigned for crime, it is immaterial whether the jurors are of the same or an opposing political party. Usually this is a question which excites neither the interest of the accused, nor that of his counsel. But when the offense springs from an intense political contest, all becomes different. Then the political complexion of the jury is all-important. The administration of even-handed justice has no more insidious enemy than political prejudice. It enters unseen and unsuspected into the human mind, corrodes the reason, and undermines the judgment. Neither purity of heart nor exaltation of character affords an antidote for this deadly poison. Indeed, these virtues may well magnify the evil, for the mind thus possessed is all the more ready to enforce the oblique judgment when it has no cause to suspect its own integrity."

And again: "Nothing so surely tends to enhance the respect men owe to the law than a fairly rooted conviction that its judgments are the offspring of evenhanded justice, and of its temple an impartial jury is the chief corner stone. On the other hand, nothing is so certainly productive of distrust and fear out of which springs anarchy, as a well-grounded suspicion that judicial procedure is tainted with partiality and indirection. That conviction forms the basis for the love of the citizen of his state in return for 'the equal protection of the laws,' and this suspicion engenders the scorn and hatred which all good men entertain for that oriental system of judicature with whose decrees the chance of the dice box is honest by comparison, and of this suspicion a partisan jury is the most effective promoter."

The federal thought on the subject is expressed in Act June 30, 1879, c. 52, § 2 [1 U. S. Comp. St. p. 624], which provides that jurors in the federal courts shall be selected by the "clerk of the court and a commissioner, to be appointed by the judge thereof, which commissioner shall be a citizen of good standing, residing in the district in which such court is held and a well-known member of the principal political party in the district in which the court is held opposing that to which the clerk may belong, the clerk and said commissioner each to place one name in said box alternately, without reference to party affiliation, until the whole number required shall be placed therein."

It remains, so far as this branch of the case is concerned, to consider and determine whether, within the meaning of section 641, it appears that the defendant is denied or cannot enforce in the state courts this constitutional right thus determined to be his. It will be noted that he is entitled to a removal if either he is denied or cannot enforce such right therein. Justice Bradley, in the case of Texas v. Gaines, Fed. Cas. No. 13,847, in referring to the third section of the original civil rights act of April 9, 1866 (14 Stat. 27, c. 31)—substantially the same as section 641 in wording—said:

"What says the third section? How does it describe and define those who are within the meaning of the act? It defines them as 'persons who are denied or cannot enforce in the courts or judicial tribunals of the state or locality where they may be, any of the rights secured to them by the first section of this act.' Here are two classes: (1) Persons who are denied any of the rights secured to them by the first section of the act; (2) persons who cannot enforce in the courts any of said rights."

And first, does it appear that the defendant is so denied the rights in question? Here, again, the question breaks in two. What facts appear in relation to a denial thereof? And what is the proper legal construction to be placed upon such facts?

It will aid in presenting them to make a preliminary statement in regard to two matters. One relates to the method of selecting jurors prescribed by the statutes of Kentucky. A certain number of jurors are selected annually by three jury commissioners appointed annually for each county by the judge of the circuit court. In Scott county the jury commissioners seem to be appointed each year, at the regular October term of the circuit court thereof. The names of the jurors thus selected are placed by the commissioners in a wheel, and the regular panels of grand and petit jurors for each term thereafter during the year are drawn from the wheel. The commissioners draw the panels for the first term thereafter, and the circuit judge draws them for the subsequent terms. The statute prescribes that the commissioners shall be intelligent and discreet housekeepers of the county, over 21 years of age, resident in

different portions of the county, and having no action in court requiring the intervention of a jury. They are required to select the jurors from the intelligent, sober, discreet, and impartial citizens, resident housekeepers in different portions of the county, over 21 years of age. It is provided that the judge of the circuit court may at any time during the term when it is necessary, after the regular panel is for any reason exhausted, draw and select from the wheel other persons to act as grand and petit jurors, or he may, in his discretion, direct that such jurors be supplied from bystanders. The other matter referred to is the number of peremptory challenges allowed in the state courts in a felony prosecution. They are five to the commonwealth, and fifteen to the defendant.

Now as to the facts that appear in relation to a denial of defendant's said constitutional right. And first, what facts are alleged in the second paragraph of the petition? Four circumstances are alleged that have a tendency to induce a suspicion, if not an actual belief, that, in the selection of the jurors from which the jury that tried defendant on each occasion came, those persons qualified for jury service who belonged to the same political class as defendant, to wit, Republicans, were purposely excluded therefrom, and thus discriminated against. The first is the existence of a state of feeling against the defendant on the part of those of opposite politics because of his alleged offense. It is alleged that at the regular election for Governor and other state officials in November, 1899, said William Goebel was the Democratic candidate for Governor, said William S. Taylor was the Republican candidate therefor, and defendant was the Republican candidate for the office of Secretary of State; that said Taylor, defendant, and the other Republican candidates were declared elected and inducted into their respective offices; that thereafter Goebel contested Taylor's right to the office of Governor, defendant's opponent contested his right to the office of Secretary of State, and like contests were had as to the other offices; that it was pending said contest that Goebel was assassinated; that the public mind was greatly inflamed, and bitter and intense political animosities were excited and fostered by reason of said election, contest, and assassination, and that such feelings existed at each of said three trials, and still existed against him, on the part of Goebel Democrats throughout the state, and particularly in Scott and Bourbon counties. At the election in 1899 there was a split amongst the Democrats; John Young Brown ran as an Independent; and by "Goebel Democrats" is meant those that supported Goebel. The second is that those who had to do with selecting the jurors from whom the three juries came were all Goebel Democrats. The third is that at the time of each of the trials there were in Scott and Bourbon counties such a number of Republicans qualified for jury service that it is not likely that a jury would have been obtained having no Republicans upon it. It is alleged that at the presidential election in November, 1900, 2,500 Democratic and 2,100 Republican votes were cast in Scott county; that in the presidential election in 1896 2,600 McKinley and 2,200 Bryan votes were cast in Bourbon county; and that at the state election in 1899 Taylor received 27 more votes than Goebel in Bourbon county. It appears from

139 F.—30

the returns that at the last three presidential elections in said two counties the vote was as follows:

### Scott County.

|      | Dem. Votes. | Rep. Votes. |
|------|-------------|-------------|
| 1896 | 2,374       | 1,713       |
| 1900 | 2,539       | 2,107       |
| 1904 | 2,237       | 2,111       |

The average Democratic vote for the three elections was 2,378, and the average Republican vote for same was 1,977. For the last two years the former average was 2,388, and the latter 2,109.

### Bourbon County.

|      | Dem. Votes. | Rep. Votes. |
|------|-------------|-------------|
| 1896 | 2,210       | 2,578       |
| 1900 | 2,411       | 2,217       |
| 1904 | 2,586       | 2,147       |

The average Democratic vote for the three elections was 2,402, and the average Republican vote for same was 2,314. For the last two years the former average was 2,498, and the latter 2,183. It is further alleged that the number of white Republican voters in Scott county is about 1,300, and that in Bourbon county three-fifths of the Republican voters are negroes, which would make the white Republican voters in Bourbon county about 900. The proportion of Democratic voters to Republican white voters in Scott county is not as great as two to one. In Bourbon county it is somewhat less than two to one, and not as great as three to one. If, then, no more Democratic voters in proportion were disqualified or excusable from jury service than Republican white voters, which it is reasonable to conclude was the case, it follows that the proportion of Democratic qualified and nonexcusable jurors to Republican white qualified and nonexcusable jurors in Scott county was not as great as two to one, and in Bourbon county it was between three to one and two to one. The fourth and last circumstance referred to is that upon neither one of the three juries that tried defendant was there a single Republican. As to the composition of the first jury, it is alleged that it was composed "almost, if not entirely, of Goebel Democrats, and no Republicans"; as to the second jury, that it was composed "entirely of Goebel Democrats"; and, as to the third, that it was composed "entirely of Goebel Democrats—one juror, a Goebel supporter, but of doubtful politics, excepted." Then certain acts are alleged in relation to the selection of the jurors from which said juries were impaneled, and to the impaneling of the juries therefrom, which, taken in connection with said circumstances, establish, if true, that in such selection Republicans were discriminated against and purposely excluded therefrom, in order that there might not be any of them on the jury to try defendant, and that the Scott circuit court held that such discrimination was not illegal, and the defendant had no right to have it refrained from. It is alleged, as to the first trial at the July-August, 1900, special term, that there were in the wheel the names of 100 undrawn jurors, placed there, prior to the election of 1899 and the assassination of

Goebel, by impartial and unbiased jury commissioners appointed by the circuit judge in October, 1899; that, upon the regular panel being exhausted, defendant moved said judge to select additional jurors required from the wheel, and that he refused to do so, and directed the sheriff of Scott county to summon first 100 men, and then 40 men, for jury service from said county, and to summon no man from Georgetown, the county seat of said county, but to go out in the county for that purpose; that the men so summoned were, with the exception of three or four Republicans and Independent Democrats, known to be partisan Goebel Democrats, and were, with said exception, purposely summoned because of their known party affiliation; that when the men so summoned appeared in court they were seated on the side of the courtroom separate and apart from the spectators and other persons, and said judge, without notice to defendant or his counsel, or making any request of either to accompany him, left the bench, went to the place where said veniremen were seated, called them up to him one at a time, not in defendant's or in his counsel's hearing, and, without swearing them, excused such of them as he saw fit from jury service; and that from the jurors so summoned the first jury was obtained. As to the second trial, at the regular October term, 1900, it is alleged that at the October term, 1900, when an appeal was pending from the judgment entered upon the verdict of the first jury, and there was a possibility of its being reversed and another trial had, said judge appointed as jury commissioners John Bradford, Ben Mallory, and H. H. Haggard, all Goebel Democrats; that said jury commissioners placed in the wheel the names of 200 citizens of Scott county, 195 of whom were Goebel Democrats, and 5 of whom were Republicans; that, of the names so placed in the wheel, 75 were drawn at the regular February and May, 1900, terms of said court, and 125 were drawn at the regular October, 1901, term, upon defendant's second trial; that, of the 5 Republicans so placed in the wheel at the beginning, 1 was drawn at the February term, 1 at the May term, and the other 3 at the October term; that, of the 3 drawn at the October term, two were disqualified by previously formed opinions, and the other was peremptorily challenged by the commonwealth; that a jury was not obtained from said Scott county jurors, probably as much as 6 jurors being obtained therefrom, and the sheriff was directed to summon veniremen from Bourbon county; that he summoned 168 veniremen from said county, all of whom were Goebel Democrats, except 3 who were Republicans; and that from the jurors so summoned the remaining jurors of the second jury were obtained. As to the third jury at the last trial at the special term in August, 1903, it is alleged that 176 jurors were summoned from Bourbon county, and, of them, 3 or possibly 4 were Republicans, and the remaining 172 or 173 were Goebel Democrats, and were summoned because they differed politically from defendant. It is further alleged that on each of said trials Republicans and Independent Democrats qualified for jury service were intentionally passed by in selecting and summoning veniremen, in order that de-

fendant might not have a fair trial by a jury of his peers, impartially selected, but to the end that a jury might be selected to convict him; that in the second trial he objected to the formation of a jury from the veniremen summoned, and moved the court to discharge the entire venire, on the ground that he could not obtain a fair trial before a jury selected therefrom, and filed an affidavit in support thereof, but, although the statements in said affidavit were true, and known to be true by the court, he was forced to submit to trial before a jury composed as heretofore stated; that on the third and last trial he asked the court to admonish the sheriff to summon an equal number of men of each political party, which request was refused; that he then asked the court to instruct him to summon the talesmen as he came to them, regardless of political affiliation, which request was also refused; and that at each of said trials the facts in relation to the jurors as heretofore stated were embraced in affidavits filed in support of challenges to the panel and the venire, and objections to the formation of the jury from the men so summoned, and also in the motions and grounds for new trial prepared and filed on behalf of defendant at each of the trials, but they were disregarded by the court, and defendant's challenges to the panels and to the venire, and his motion for new trial, in each instance were overruled.

The commonwealth of Kentucky has not filed a reply to said petition for removal, or in any way taken issue with the defendant as to any of the allegations thereof. Said allegations must therefore be accepted as true, save in so far as they may be contradicted by the transcript on file herein. In the case of Dishon v. C., N. O. & T. P. Ry. Co., 133 Fed. 471, 66 C. C. A. 345, Judge Richards, in discussing the affirmative allegations of a petition for removal in a civil suit under the jurisdictional acts of 1887–88, said:

"If these averments were not true, the plaintiff should have denied them, and an issue would then have been made for the court below to try and determine. No answer was filed; no issue in any other way was taken. The plaintiff contented himself with making a motion to remand, and which only raised a legal question, namely, whether, upon the facts stated in the petition for removal, taken in connection with the record, a case for removal was made out."

In the case of Whitten v. Tomlinson, 160 U. S. 231, 16 Sup. Ct. 297, 40 L. Ed. 406, Justice Gray, in referring to a petition for a writ of habeas corpus under sections 751–755, Rev. St. U. S. [U. S. Comp. St. 1901, pp. 592, 593], said:

"In a petition for a writ of habeas corpus, verified by oath of the petitioner, as required by Rev. St. U. S. § 754, facts duly alleged may be taken to be true, unless denied by the return or controlled by other evidence. But no allegation of fact in the petition can be assumed to be admitted, unless distinct and unambiguous."

The allegations of the petition for removal are not borne out by the transcript in all their detail. They are, however, borne out to a substantial degree, and are not contradicted in any substantial particular. It establishes the discrimination complained of in the selection of the jurors by the subordinate officers having to do

therewith on the second and third trials, and that on both trials the Scott circuit court held that such discrimination was not illegal, and the defendant had no right to complain thereof, it not being claimed that the jurors selected did not possess the statutory qualifications. As to the first trial, all that the transcript shows is that it was one of the grounds of defendant's motion for new trial that the circuit judge, after the regular panel was exhausted, had refused to draw from the wheel the names of jurors placed there in the fall of 1899, before any motive for discrimination had arisen, concerning which Judge Du Relle had this to say in the opinion delivered by him on behalf of the majority of the Court of Appeals on the first appeal:

"In the grounds relied on in the motion for new trial it is stated that the court overruled the motion of appellant, after the regular panel was exhausted, to draw the remaining names necessary to complete the jury from the jury wheel. It is to be regretted that, in a case concerning which so much feeling existed, the simple and easy mode was not adopted, which would have put beyond cavil the question of the accused having a trial by jury impartially selected. This will doubtless be done upon the succeeding trial."

There seems to have been no challenge to the venires or the panel on this trial on account of any discrimination. As to the second trial, the transcript shows that the defendant challenged the Scott county jurors drawn from the wheel and each of two Bourbon county venires before the panel was completed, and the panel after it was completed, because of the discrimination complained of, and that the challenges were overruled. It further shows that defendant filed in support of said challenges the affidavits of himself and three citizens of Scott county, and one citizen of Bourbon county, and that the commonwealth filed the affidavits of one citizen of Scott county, one of its employed counsel, of the deputy sheriffs of Scott and Bourbon counties who summoned and assisted in summoning the Bourbon county jurors, and of two citizens of Bourbon county, against the challenges. The state of political feeling and the political complexion of the voters of Scott and Bourbon counties, of the qualified jurors therein, of the three jury commissioners appointed in October, 1900, pending the first appeal, when there was the possibility of another trial, of the Scott county jurors placed in the wheel by said commissioners, and those remaining therein at the second trial, and of the Bourbon county jurors summoned at said trial, were made out by said affidavits, the same as stated in the second paragraph of the petition, as heretofore cited. Said affidavits specified the names of the five out of two hundred Scott county jurors placed in the wheel by the jury commissioners appointed in October, 1900, pending the first appeal, and when another trial was possible, and the three out of 168 Bourbon county jurors summoned by the deputy sheriffs, who were Republicans. The facts thus stated, as shown by said affidavits, were not contradicted by any statement in any counter affidavit, save as to the political complexion of the jurors summoned from Bourbon county. The sole fact stated in any of the affidavits as to the Scott county jury commissioners and as to the Scott county jurors was that they

possessed the statutory qualifications. As to the political complexion of the Bourbon county jurors, one of the Bourbon deputy sheriffs stated that the claim that only two of the first venire were Republicans was untrue, and that many more of them voted for McKinley in 1896, and against Goebel in 1899; another of said sheriffs stated, as to the claim that only one of the second venire was a Republican, that many more of them had voted as aforesaid; and the two citizens of Bourbon stated that not less than eight of the first venire voted against Goebel, and that not less than five of the second venire were Republicans. Neither of these affiants specified the name of any person upon either venire who was a Republican, other than the three specified in the defendant's affidavits. The showing made by these affidavits amounted, at the most, to this: That, out of one hundred and sixty-eight jurors summoned from Bourbon county, as many as eight voted against Goebel, and as many as five were Republicans. In each of the affidavits of the Bourbon county sheriffs and citizens it was stated that the Bourbon county jurors were sober, discreet, intelligent, good citizens of Bourbon county, thus coming up to the statutory requirement; and in the affidavits of the Scott county deputy sheriffs, who did the actual summoning of the Bourbon county jurors, they state that they told the deputy sheriffs of Bourbon county that they desired men who had the qualifications of jurors. In view of the precedent action of the judge of Scott circuit court in refusing at the first trial to draw from the wheel the names of jurors placed there in the fall of 1899, when no motive for making the discrimination complained of existed, and in appointing three Goebel Democrats as jury commissioners in October, 1900, pending the first appeal, when there was the possibility of another trial, and of the showing made in the affidavit filed before him on said challenges, the reasonable inference is that the challenges were overruled, not because it was held that there had not been the discrimination complained of, but because it was held that such a discrimination was not illegal, and the defendant had no right to complain of it, inasmuch as it was not questioned that the jurors selected possessed the statutory qualifications.

As to the third trial, the transcript shows that the defendant challenged each venire summoned from Bourbon, and the panel after it was completed, because of the discrimination complained of, and that said challenges were overruled. It further shows that the defendant filed in support of said challenges the affidavit of himself and of two citizens of Bourbon county, and that the commonwealth filed the affidavits of the officers who summoned and assisted in summoning the two venires, against the challenges. The political complexion of the two venires was shown by defendant's affidavits to be as alleged in the second paragraph of the petition. In addition, it was specifically shown how the discrimination complained of was actually practiced as to the first venire, as follows, to wit: That in Paris and on the Millersburg pike the officers summoned six Goebel Democrats, and passed by four Republicans and one In-

dependent Democrat; that on the Maysville, Lexington, and Clin-tonville pikes they summoned eleven Goebel Democrats, and passed by seven Republicans and one Independent Democrat; that on the Jackstown pike they summoned five Goebel Democrats, and passed by three Republicans; that on the North Middletown and Flat Rock pikes they summoned four Goebel Democrats, and passed by three Republicans; that in the town of Ruddles Mills and on the Millersburg and Ruddles Mill pike they summoned eight Goebel Democrats, and passed by two Republicans and one Independent Democrat; and in the vicinity of Clay's Crossroads, and the terri-tory included by the Clay and Kiser pikes and the Georgetown and Cynthiana pikes, they summoned three Goebel Democrats, and passed by four Republicans and eleven Independent Democrats. The affidavits specified the name of each Goebel Democrat so taken, and each Republican and Independent Democrat so left, in these various portions of Bourbon county, and that each Republican and Independent Democrat so left was a qualified juror. The affidavits of the officers filed by the commonwealth denied that they had been guilty of the discrimination charged, and stated that the persons summoned were sober, discreet, and intelligent housekeepers of Bourbon county, qualified for jury service; that many of the per-sons passed by were not qualified for jury service, some of them being United States revenue officials, others old and infirm, and others practicing physicians; that, of the 95 constituting the first venire, more than two were Republicans, and a number were Pro-hibitionists, Republicans, and Independent Democrats; that at least 90 per cent. of the persons qualified for jury service were Democrats, and many of the Republicans who would otherwise be competent as jurors were in the service of the United States govern-ment as storekeepers, gaugers, rural carriers, post office, and other employments; and that a number of the persons named as Repub-licans and Independent Democrats were lifelong Democrats. No specification was made, however, as to who of the persons so named as Republicans were such Democrats. On overruling the challenge to the first venire, the court gave its reason for so doing, and enter-ed it of record. On overruling the challenge to the second venire and the panel, no reason was given, so far as the record shows. The reasonable presumption is that it was for the same reason that the first challenge was overruled. That reason was that it was not claimed in the grounds of the challenge that the jurors were not sensible, discreet, and sober men, and housekeepers of Bourbon county, over 21 years of age, and it was expressly stated and entered of record that the challenges was overruled without any refer-ence to the affidavits. The transcript further shows that before the venires were summoned the defendant moved the court to instruct the sheriff to summon persons without regard to political affilia-tion, which motion was overruled. There can be no question, then, but that the Scott circuit court held on this third and last trial that defendant had no right to have jurors summoned without discrim-ination against the political class to which he belonged. As said by Judge Barker in the dissenting opinion heretofore referred to:

"It is clear that the trial judge was of opinion that it was not an offense against the fourteenth amendment, or a denial of the equal protection of the laws to the defendant, to exclude Republicans from the jury solely because they were Republicans, provided the selected Democrats were possessed of the statutory qualifications required for jury service. There was no decision upon the evidence offered as to whether in fact there had been the discrimination complained of; it being necessarily assumed that this was, if true, an immaterial circumstance."

That a refusal to hear evidence offered by the defendant in a criminal prosecution that he has been illegally discriminated against in the selection of jurors is a violation of the fourteenth amendment, and a denial of the equal protection of the laws guarantied by it, has been settled by the Supreme Court of the United States in the recent cases of Carter v. Texas, 177 U. S. 442, 20 Sup. Ct. 687, 44 L. Ed. 839; Rogers v. Alabama, 192 U. S. 226, 24 Sup. St. 257, 48 L. Ed. 417. The Carter Case was an indictment against a negro found in the state court. The defendant moved to quash the indictment because of discrimination against his racial class in the selection of the grand jury. After reading his motion, he asked leave of the court to introduce witnesses, and offered them, to prove and sustain the allegations therein made. The court refused to hear any evidence in support of said motion, and overruled it, without investigating into the truth or falsity of the allegations of said motion. The Supreme Court reversed the judgment against him on this ground. Mr. Justice Gray said:

"Whenever by any action of a state, whether through its Legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in a criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the fourteenth amendment of the Constitution of the United States." And again: "The necessary implication is that the defendant has been denied a right duly set up and claimed by him under the Constitution and laws of the United States."

The Rogers Case was also an indictment against a negro, found in the state court. The defendant moved to quash the indictment because of discrimination against his racial class in the selection of the grand jury. The state court struck the motion from the files because of its prolixity. The Supreme Court held the action of the state court in this particular was a denial to defendant of the equal protection of the laws, and reversed the judgment against him.

It therefore appears from the second paragraph of the petition for removal, in connection with the transcript, that in the selection of the jurors on the second and third trials the defendant has been discriminated against by those who have had to do therewith, and that on each trial it was held by the Scott circuit court that the defendant had no right to complain thereof, inasmuch as the jurors selected possessed the statutory qualifications. He has therefore been denied the equal protection of the laws guarantied him by the fourteenth amendment both by said subordinate officers and said court. There is no claim put forward in the petition that the Court

of Appeals decided against defendant's said constitutional right on either appeal, or that he has been denied the equal protection of the laws by said court. By section 281 of the Criminal Code of Practice of Kentucky it is provided as follows:

"The decisions of the court [trial court] upon challenges to the panel and for cause, upon motions to set aside an indictment and upon motions for a new trial shall not be subject to exception."

Because of this Code provision the Court of Appeals refused on the second and third hearings therein to pass upon the action of the Scott circuit court on the second and third trials therein in relation to the defendant's challenges to the venires and panels. It held that jurisdiction had not been conferred upon it to hear and pass upon such questions, and hence declined to express any opinion in regard thereto. On the second hearing in the Court of Appeals, Judge O'Rear, who delivered the opinion on behalf of the majority, said:

"Objections were made by affidavit and motion to the manner of selecting the jury in this case, and to the venire because of its bias. The charges made are of a more serious import, if true. But it is proper to state that they are controverted, except as to the fact of the political affiliation of the panel summoned in the case. It should not be said, and it cannot be true, that per se a Democrat is disqualified from fairly trying a Republican charged with crime, or vice versa. If men should be selected as jurymen whose prejudices would be relied on to procure a conviction or acquittal of one whom they are trying, charged with crime, we are fully persuaded that the fact of the politics of such jurymen would not be the cause of such selection. It would be the character of those so selected. But it has been held (Terrell v. Com., 13 Bush, 246; Kennedy v. Com., 14 Bush, 342; Forman v. Com., 86 Ky. 606, 6 S. W. 579) that objection to the panel of the jury shall not be subject to review by this court. It is the opinion of the court (a point upon which, however, we have not been in entire accord) that under paragraph 281, Cr. Code Prac., this court has no jurisdiction to pass upon these questions. In the opinion of some of the members, when jurisdiction is conferred upon this court of this class of cases it is not competent for the Legislature to limit the court as to what errors it may reverse for, or as to what shall not be the subject of reversal; that to so allow is to leave the propriety and legality of the proceedings in the court to legislative, and not judicial, control. The majority of the court adheres to the former rulings on this subject. The manner of selecting the jury, except as regulated by statute, is within the control of the trial court. To its sense of fairness and desire to dispense that justice in trials whose essence is impartiality, this question must be left."

On the third hearing, though the Court of Appeals reversed the judgment of the lower court, it refused to do so on the ground that it had erred in its action as to the challenges. Judge Barker delivered the opinion of the majority of the court, setting forth the grounds upon which the reversal was had, as heretofore set forth. He also filed a separate opinion, from which I have quoted quite liberally, in which two other of the judges concurred, and in which he took the ground that the judgment should be reversed upon the error of the lower court as to the challenges. He said:

"Having written the opinion of the court in this case on the only theory upon which a majority of the members could agree, the deep conviction I have on the federal question contained in the record constrains me to express in a separate opinion my personal views on that subject."

And after doing this he said:

"In conclusion, I am of the opinion that the trial judge should have passed upon the question of fact presented by the appellant as to the summoning of the jurors, and, if there was even a well-grounded suspicion that unfairness had prevailed, the jury should have been discharged, and others summoned under such safeguards as would preclude indulgence in partisan methods."

He took the position that the Court of Appeals had jurisdiction to pass on said question by virtue of article 6 of the federal Constitution, which provides that:

"This Constitution and the laws of the United States which shall be made in pursuance thereof and all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

It is not expressly stated in the opinion delivered on the last hearing that the court refused to pass on this federal question because of said section 281, but there can be no doubt that such was its reason in not doing so. So far as the action of said subordinate officers and the Scott circuit court in denying defendant the equal protection of the laws is concerned, it has not been contended otherwise on behalf of the commonwealth on the hearing of the motion; nor has one serious word been said to the effect that the claim of defendant in this particular is not entirely correct. The sole position taken on the part of the commonwealth has been that such action by said subordinate officers and by said court is not a denial in the judicial tribunals of the state of the equal protection of the laws, within the meaning of section 641. It is contended that defendant's sole remedy is, in case such action is repeated on another trial, to take the case to the Supreme Court of the United States by writ of error, and get it to correct the wrong done him. Are this position and contention correct? What is the proper legal construction to be placed upon such action of said subordinate officers and said court? Because of it, can it be said that the defendant is denied the equal protection of the laws in the judicial tribunals of the state where the prosecution against him is pending, within the meaning of section 641? The determination of this question demands ascertainment by us of the true intent and meaning of said section in this particular. But before entering upon its construction, a word or two as to whether the section should be liberally or strictly construed. It is well settled that the fourteenth amendment should be liberally construed. In the case of Strauder v. West Virginia, supra, Mr. Justice Strong said, "If this is the spirit and meaning of the amendment, whether it means more or not, it is to be construed liberally to carry out the purposes of its framers." As section 641 was enacted to enforce said amendment, there would seem to be some ground for holding that it, too, should be construed liberally. Another consideration that may be thought to lead in the same direction is this: The object of the jurisdictional acts of 1887–88, as is well known, was to restrict federal jurisdiction in civil suits. This it did by enlarging the amount in

controversy essential to jurisdiction, and cutting down the time within which a petition for removal might be filed, and perhaps in other ways. But by section 5 thereof sections 641, 642, and 643 were continued in force, without a change in any of their provisions. On the other hand, attention may be directed to the fact that the jurisdiction conferred by section 641 is a delicate one, and, in its exercise, calculated to disturb the harmony that should exist between the federal and state jurisdictions. This thing of taking a state prosecution for a state offense pending in a state court out of said court bodily, and transferring it to a federal court, under circumstances that cannot help but be construed as a reflection upon the state court and the state itself, is a very serious matter; and, in view of it, it may be thought that the section should be strictly construed. Judge Rives characterized the federal jurisdiction thus acquired as "an anomalous jurisdiction," and in the case of Fowlkes v. Fowlkes, Fed. Cas. No. 5,005, he thus expressed himself as to how section 641 should be construed:

"It is observable that the late comprehensive act of March 3, 1875, embraces cases only originally cognizable by the federal courts. The same is the case of removal on the ground of prejudice or local influence. The exception to this applies to cases of public officers, and to persons denied or prevented from enforcing in the courts of the state their equal civil rights. This departure from the fundamental principle of limiting removals to cases cognizable in the federal courts results from the duty of the government to its officers, and the obligations of Congress to enforce by appropriate legislation the provisions of the fourteenth amendment. These exceptional statutes, therefore, are to be strictly construed—interpreted, if practicable, in subordination to and conformity with the theory of our judicial system, state and federal, and the provisions of the Constitution."

But, however this may be, the statute is not to be limited by construction because of the delicacy of the jurisdiction it confers. In referring to section 643 in Tennessee v. Davis, supra, Mr. Justice Strong said:

"That the act of Congress does provide for the removal of criminal prosecutions for offenses against the state laws, where there arises in them the claim of the federal right or authority, is too plain to admit of denial. Such is its positive language, and it is not to be argued away by presenting the supposed incongruity of administering state criminal laws by other courts than those established by the state."

All certainly that can be required is that it should be made clear and reasonably certain that the case in question comes within the meaning of the statute.

What, then, does the statute mean by a denial in the judicial tribunals of a state of the equal protection of the laws, and do said acts of said subordinate officers and of said Scott circuit court come within that meaning? Before attempting a construction of this provision of section 641 on our own account, it should be ascertained first what, if anything, has been held in regard thereto by the courts in which question as to its meaning has arisen, for, if it has been held by courts whose decisions are binding on me that said acts do or do not come within such provision, I have nothing

more to do than to follow them. All the cases that have arisen under the statute have been in relation to alleged discriminations against negroes because of their race and color, but the principles laid down with reference to such discriminations apply equally well to the case in hand. The first cases that arose under the statute presented the question as to whether strong prejudice in the community where the prosecution was pending against the defendant on account of his race, color, and politics was sufficient to make out a case under the statute, and the question was acted upon by the state courts in determining the effect of the removal proceedings on their jurisdictions. It was held by the Supreme Courts of North Carolina and Texas that such prejudice was sufficient to justify a removal. North Carolina v. Dunlop, 65 N. C. 288; Gaines v. State, 39 Tex. 606. In the North Carolina Case the ground of removal alleged in the petition was that there was prejudice against the defendant on account of his color and politics; that he was an active member of the Republican party, and deceased of the Democratic party; that there was a systematic effort by Democrats to produce the impression that he killed deceased from political motives; that county commissioners and sheriff and deputies were all Democrats, and colored men were seldom summoned, and juries were almost entirely Democrats; that there was less chance of enforcing his rights than those of a white man, and probabilities of denial of them much more enhanced; that these feelings were intensified by successful attempts made to give political color to the homicide, and feeling against him was so bitter he could not obtain justice; and that as full and equal benefit of laws of the state and proceedings for the security of person and property as were enjoyed by the citizens thereof was denied to him, and could not be enforced on his behalf. The case alleged in the petition for removal in the Texas case was substantially the same as that in the North Carolina case. But the federal courts at once took a narrower view of the statute. Justice Bradley remanded the Texas case to the state court when it came before him. Texas v. Gaines, Fed. Cas. No. 13,847. And he took a like position in Ex parte Wells, Fed. Cas. No. 17,386. So did Judge Rives, in Virginia, in the case of Fowlkes v. Fowlkes, supra. It is evident that a case of local prejudice could not be within the statute. Its constitutionality depended upon said clause of the fourteenth amendment. That clause prohibited state action. It had nothing to do with individual action—much less, with an individual or community state of mind. The statute probably could not have made such state of mind a ground of removal. It certainly did not intend to make it so. The question was then considered and discussed, whether action by a state through any of its agencies—legislative, executive, or judicial—within the prohibition of said clause of the fourteenth amendment, could amount to such a denial, and therefore justify a removal. It prohibited state action through either agency. Could a removal be had for state action within the prohibition by either agency? Judge Rives of Virginia stated in the cases of Fowlkes v. Fowlkes, supra, and Ex

parte Reynolds, Fed. Cas. No. 11,720, that it could, or, in other words, that section 641 was as broad as said clause of the fourteenth amendment. In the Fowlkes Case he said:

"When we construe this language in subordination to the constitutional amendment, it. seems to me it clearly points to the action of the state in one of its three capacities—legislative, executive, or judicial. Ought not the petition in such a case to designate some law, some judicial ruling, some executive act, as the denial of his equal and civil rights, or as constituting the obstacle to his obtaining them?" And again: "This enactment of Congress was designed to secure him the equal protection of the laws, and his equal civil rights, when invaded by the state in any part of its administration—legislative, executive, or judicial."

In the Reynolds Case he said:

"A state is a sort of trinity. It exists, acts, and speaks in three capacities —legislative, executive, and judicial. What is forbidden to it in one capacity is forbidden to it in each and all. It may not infringe this article by legislation, but it may equally do so by its courts or its executive authorities. Hence it seems to me it is in strict pursuance of this article to base the intervention of the federal courts on the inability to enforce in the judicial tribunals of the state, or in some part thereof, the equal civil rights secured by this article. The mischief is the same whether the deprivation proceeds from the law, the courts, or the executive. It is equally attributable to the state. The laws of the state may be all conformable to the requirements of the article, but its infraction may rest with the courts or executive authorities of the counties. The amendment, to be potential and attain its end, should be enforced, as these enactments purport, by providing a remedy for the dereliction, in whatever quarter it may appear. Hence, to find a casus for the application of this law of federal intervention under the theory of this article, we are not restricted to the action of the Legislature alone. It clearly contemplates the failure of executive or judicial remedies for the enforcement of these equal civil rights."

Judge Rives, however, seems to have overlooked the words of the statute, and not to have observed that the denial which it provided should be a cause for removal was a denial "in the judicial tribunals of the state." When the Reynolds Case came before the Supreme Court, as it did under the style of Virginia v. Rives, it was laid down that by reason of this limitation the statute was not as broad as the Constitution. Justice Strong said, "The constitutional amendment is broader than the provisions of that section;" and he pointed out in his opinion an instance in which it was broader. The grounds for removal stated in the petition in the case were three. One was that a strong prejudice existed in the community against the defendants, independent of the merits of the case, and based solely upon the fact that they were negroes, and the man they were accused of having murdered was a white man. Another one was that negroes had never been allowed to serve as jurors either in civil or criminal cases in the county in any case, civil or criminal, in which negroes were interested. The third one was that the court before the trial had overruled defendants' motion that a portion of the jury by which they were to be tried should be composed in part of competent negroes. Judge Rives held that the petition stated a case within section 641, and, under a writ of habeas corpus, took custody of the negroes. Of course, no case was stated in the

allegations as to the prejudice, as Judge Rives had held in the Fowlkes Case. Nor was any case stated in the allegation that negroes had not been allowed to serve as jurors, for that may have been true, and yet the exclusion may not have been the result of discrimination on account of race. He therefore based his action on neither one of these grounds, but solely upon the refusal of the state court to provide a mixed jury. Thereupon the state of Virginia applied to the Supreme Court of the United States for a mandamus to compel restoration of the persons to state custody, which made the case of Virginia v. Rives. The court granted the writ, holding that the defendants were not entitled to a removal on either ground stated in the petition. I have heretofore quoted what Justice Strong had to say on the ground as to the mixed jury. This was really all that was up for decision in that case. But the fact that this was the first time that section 641 was before the Supreme Court, and the broad position taken by Judge Rives, led to a consideration of the statute somewhat at large. In the course of the argument it was stated that the officer having to do with selecting the jurors from which were drawn the juries that indicted and tried defendants had illegally discriminated against them because of their race and color. This statement led the court to consider and determine whether such discrimination by such an officer was within the statute, and it was held that it was not. Justice Strong said:

"If, as was alleged in the argument, though it does not appear in the petition or record, the officer to whom was intrusted the selection of the persons from whom the juries for the indictment and trial of the petitioners were drawn, disregarding the statute of the state, confined his selection to white persons, and refused to select any persons of the colored race solely because of their color, his action was a gross violation of the spirit of the state's laws, as well as of the act of Congress of March 1, 1875, c. 114, 18 Stat. 335 [U. S. Comp. St. 1901, p. 1259], which prohibits and punishes such discrimination. He made himself liable to punishment at the instance of the state, and under the laws of the United States. In one sense, indeed, his act was the act of the state, and was prohibited by the constitutional amendment. But inasmuch as it was a criminal misuse of the state law, it cannot be said to have been such a denial or disability to enforce in the judicial tribunals of the state the rights of the colored men as is contemplated by the removal act (section 641). It is to be observed that act gives the right of removal only to a person who is denied or cannot enforce in the judicial tribunals of the state his equal civil rights, and this is to appear before trial."

And again he said:

"But when a subordinate officer of the state, in violation of state law, undertakes to deprive an accused party of a right which the statute law accords to him, as in the case at bar, it can hardly be said that he is denied or cannot enforce in the judicial tribunals of the state the right which belongs to him. In such a case it ought to be presumed the court will redress the wrong. If the accused is deprived of the right, the final and practical denial will be in the judicial tribunal which tries the case, after the trial has commenced. If, as in this case, the subordinate officer whose duty it is to select jurors fails to discharge this duty in the true spirit of the law—if he excludes all colored men solely because they are colored—or if the sheriff to whom a venire is given, composed of both white and colored citizens, neglects to summon the colored jurors only because they are colored, or if a clerk whose duty it is to take the twelve names from the box rejects all the colored jurors for the same reason, it can with no propriety be said the defendants' right is de-

nied by the state, and cannot be enforced in the judicial tribunals. The court will correct the wrong—will quash the indictment or the panel—or, if not, the error will be corrected in a superior court. We cannot think such cases are within the provisions of section 641."

Such denial was not, therefore, a denial in the judicial tribunals of the state. It was simply an occasion for such tribunal to correct the wrong done.

What was thus said in Virginia v. Rives was subsequently decided by the Supreme Court in the cases of Neal v. Delaware, supra; Gibson v. Mississippi, supra; Smith v. Mississippi, supra; Murray v. Louisiana, supra.

In the petition in the Neal Case the ground for removal stated was that, by virtue of the Constitution and laws of the state of Delaware, negroes were excluded from jury service, and that negroes otherwise qualified had always been excluded from jury service, and had been excluded from the grand jurors who returned the indictment against defendant, and from the petit jurors summoned to try the case. The state court denied the removal, and thereafter defendant moved to quash the indictment and the panels of the grand and petit juries on the same ground that removal was sought, which motion was overruled. Upon conviction had, the case went to the Supreme Court on error. It was held that the petition did not state good cause for removal, because the Constitution and laws of Delaware did not exclude negroes from jury service, and their actual exclusion by subordinate officers was not a denial, within section 641. · Mr. Justice Harlan said "that Congress had not authorized a removal where jury commissioners or other subordinate officers had, without authority, deviated from the Constitution and laws of the state, and excluded colored citizens from juries because of their race." It was held that the motion to quash the indictment and panels should have been sustained because the affidavit of the petitioner, in connection with the fact that no negro had ever been selected as a juror, grand or petit, and that the negro population exceeded 26,000 in a total population of 150,-000, made out a prima facie case of exclusion because of race, and there were no counter affidavits. It is to be noted that, so far as the action of the state court in overruling the motion to quash was concerned, it was not alleged as a ground for removal. It was made after the petition was denied, and was overruled, not because it was held that a discrimination on account of race was not illegal, but because there was no evidence of such discrimination. Chief Justice Waite, who had concurred with the majority in the decision of March 1, 1880, dissented from the holding that the judgment of the state court should be reversed because of its action on the motion to quash, on the ground that sufficient proof of the fact of discrimination because of color had not been introduced.

In the Gibson Case one of the grounds upon which removal was sought was that the officers who had to do with selecting the grand jurors who returned the indictment against the defendant had great prejudice against him because of his race, and had illegally dis-

criminated against his race in selecting said grand jurors. It was held that defendant was not entitled to a removal on said ground. The Smith and Murray Cases were like the Gibson Case. In the Smith Case, however, a motion to quash the indictment on the ground of illegal discrimination had been made and overruled prior to the filing of the petition for removal, but no evidence was introduced in support of this motion. In the Murray Case, which was like the Smith Case in the fact of prior challenge of the grand jury, the evidence showed that there had been no illegal discrimination. In neither case was the action of the court in overruling the motions to quash or challenge to the jury made a ground for removal.

It is therefore well settled that a class discrimination in the selection of jurors, grand or petit, by subordinate officers charged with their selection, nothing else appearing, is not a denial in the judicial tribunals of the state of the equal protection of the laws, within the meaning of section 641. On the other hand, it is equally well settled that where there is a statute providing for such discrimination, though unconstitutional and null and void, there is such a denial. This was held in the case of Strauder v. West Virginia, supra. That was a prosecution against a negro in the state courts of West Virginia, whose statute provided that jurors should consist of white male persons who were 21 years of age, and who were citizens of the state. The ground upon which it was so held is stated by Justice Strong in Virginia v. Rives in these words:

"When a statute of a state denies his right, or interposes a bar to his enforcing it in the judicial tribunals, the presumption is fair that they will be controlled by it in their decisions, and in such a case a defendant may affirm on oath what is necessary for removal. Such a case is clearly within the provisions of section 641."

A contrary presumption is indulged in in a proceeding under sections 751–755 to obtain release from state custody on the ground that detention is had in violation of the Constitution or a law of the United States. Justice Harlan, in Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868, said:

"The Circuit Court was not at liberty, under the circumstances disclosed, to presume that the decision of the state court would be otherwise than is required by the fundamental law of the land, or that it would disregard the settled principles of constitutional law announced by this court, upon which is clearly conferred the power to decide ultimately and finally all cases arising under the Constitution and laws of the United States."

In Neal v. Delaware, supra, it was held that, though the statutes of Delaware passed prior to the fifteenth amendment prescribed the same qualifications for jurors as for suffrage, and for suffrage that the person should be white, yet if since the adoption of said amendment the state had treated the statute as to suffrage repealed by the fifteenth amendment, and the jury statute affected to like extent thereby, the statute did not amount to a denial, within section 641. And in Bush v. Kentucky it was held that inasmuch as the Court of Appeals had held that a statute passed after the fourteenth amendment, making an illegal discrimination as to jurors, was unconsti-

tutional, because in violation of the fourteenth amendment, it no longer amounted to a denial, within such meaning. And in the Gibson, Smith, Murray, and Williams Cases, it held certain statutes and laws not to amount to such denial.

Such, then, is the full extent to which the applicability of section 641 has been determined by the courts. It is held that an illegal discrimination by subordinate officers is not within the statute, and that such a discrimination by the Legislature is. It follows, therefore, that, in so far as the illegal discrimination complained of by defendant was on the part of the subordinate officers who had to do with selecting the jurors from whom came the juries that tried him, the second paragraph of the petition does not state a case for removal. It follows further that, in so far as said discrimination was on the part of the Scott circuit court, said paragraph states a case that is beyond any case that has yet arisen under section 641, and hence a case that is as yet undetermined by the courts. The only case in which judicial action prior to the filing of the petition for removal was made a ground of the right to removal was in the case of Virginia v. Rives, and it was held therein that said judicial action so relied on was not a good ground for removal, not because it was judicial action and not legislative action, but because the judicial action complained of was not a denial of the equal protection of the laws. It was simply a refusal to provide a mixed jury, to which defendants were not entitled under the fourteenth amendment.

It is claimed, however, on behalf of the commonwealth, that it has been laid down by the Supreme Court in the various cases coming before it involving the application of section 641, in certain general remarks on that section, that judicial action can never make a case under it, and that the only thing that can do so is legislative action. As, for instance, in Virginia v. Rives, supra, Justice Strong said:

"The statute authorizes removal of the case only before trial, not after trial has commenced. It does not, therefore, embrace many cases in which a colored man's rights may be denied. It does not embrace a case in which a right may be denied by judicial action during the trial, or by discrimination against him in the sentence, or the mode of executing the sentence. But the violation of the constitutional provisions, when made by the judicial tribunals of the state, may be, and generally will be, after the trial has commenced. It is, then, during or after the trial that denial of a defendant's right by judicial tribunals occurs. Not often until then. Nor can the defendant know until then that the equal protection of the law will not be extended to him. Certainly, until then, he cannot affirm that it is denied, or that he cannot enforce it in the judicial tribunals. It is obvious, therefore, that to such a case—that is, a judicial infraction of the constitutional inhibitions after trial or final hearing has commenced—section 641 has no applicability. It was not intended to reach such cases. It left them to the revisory power of the higher courts of the state, and ultimately to the review of this court. We do not say that Congress could not have authorized the removal of such a case into the federal courts at any stage of its proceeding, whenever a ruling should be made in it denying the equal protection of the laws to the defendant. Upon that subject it is unnecessary to affirm anything. It is sufficient to say now that section 641 does not. It is evident, therefore, that the denial or inability to enforce in the judicial tribunals of a state rights secured to a

139 F.—31

defendant by any law providing for equal civil rights of all persons of the United States, of which section 641 speaks, is primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitution or laws of the state, rather than a denial first made manifest at the trial of the case. In other words, the statute has reference to a legislative denial, or an inability resulting from it."

Again, in the case of Neal v. Delaware, supra, Justice Harlan, in summing up the result of the opinions in 100 United States cases, said:

"But it was also ruled in the cases cited that the constitutional amendment was broader than the provisions of section 641 of the Revised Statutes; that, since that section only authorized a removal before trial, it did not embrace a case in which a right is denied by judicial action during the trial, or in the sentence, or in the mode of executing the sentence; that, for denials arising from judicial action after the trial commenced, the remedy lay in the revisory power of the higher courts of the state, and ultimately in the power of review which this court may exercise over their judgments whenever rights, privileges, or immunities secured by the Constitution or laws of the United States are withheld or violated; and that the denial or inability to enforce in the judicial tribunals of the state rights secured by any law providing for the equal civil rights of citizens of the United States, to which section 641 refers, is primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitution or laws of the state, rather than a denial first made manifest at the trial of the case."

This language of Justice Harlan is repeated substantially in most, if not all, of the subsequent cases. Does it have the value which counsel for the commonwealth attach to it? In considering the value of such general remarks, the rule laid down by Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 399, 5 L. Ed. 257, should be borne in mind. It is as follows:

"It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

Take up, then, the first part of this statement of Justice Harlan—the negative branch of it; that which undertakes to point out what sort of a case section 641 does not embrace—what does it amount to? Does it go to the extent of saying that under no circumstances can judicial action make a case within section 641? I submit that it does not. The only judicial action to which reference is had is judicial action that comes after the filing of the petition for removal. It is "judicial action during the trial, or in the sentence, or in the mode of exercising the sentence," or judicial action after the trial has commenced. The judicial action had in view here is the final judicial action in the prosecution and in the trial court. No other judicial action is thought of. This is settled by the reason given why it cannot make a case within section 641, and what is said as to how it can be taken advantage of. The reason so given is that it comes after the petition for removal is filed. Of course, the petition

for removal cannot be based upon that which has no existence when it is filed. The way pointed out for taking advantage of it is by carrying the case up to the higher courts, and, if necessary, on error to the Supreme Court of the United States. Of course, the only judicial action that can be so taken advantage of is judicial action in the prosecution, and judicial action that is final. It follows that judicial action outside of the prosecution or judicial action in the prosecution prior to the filing of the petition for removal is not within the negative part of Justice Harlan's statement. Then take the latter part thereof—the affirmative part—in which he undertakes to state what section 641 refers to. He says that it refers to a denial resulting from the Constitution or laws of the state, rather than judicial action at the final hearing. He, however, does not say that it refers exclusively to such a denial. He is more cautious than that. He says that it refers to such a denial "primarily, if not exclusively." Again, what are the laws of a state, within the meaning of those words as used by Justice Harlan in this connection? Did he have in mind solely the statutes of a state, or did he include rules of action laid down by the judiciary? Then as to the statement by Justice Strong at the close of the last quotation made from the opinion in Virginia v. Rives, in these words: "In other words, the statute has reference to a legislative denial, or an inability resulting from it." Bearing in mind the rule of Chief Justice Marshall quoted above, should not that be confined to a case where there has been a denial by subordinate officers, and the meaning held to be that in such a case legislative denial is essential in order to bring it within section 641? There is no escape, therefore, from the conclusion that we have here a brand-new case—a case beyond any that has been heretofore decided, or that has been had in contemplation. Does it, then, come within the true intent and meaning of section 641? Though it is beyond the cases heretofore decided, we can obtain help from them in answering this question. The result of those cases we have found to be is that an illegal discrimination of the kind complained of by the subordinate officers who select the jurors, when there is nothing in the statute requiring it, is not within section 641. On the other hand, such an illegal discrimination made by statute is within said section. Now, it would seem that if we can get a firm grasp of the idea why the one discrimination is held not to be a denial in the judicial tribunals of the state, and the other discrimination is so held to be such a denial, we will have obtained some help to the solution of said question. The reason why a discrimination by subordinate officers is held not to be a denial is, as stated by Justice Strong in a quotation already made from his opinion in Virginia v. Rives, this:

"It ought to be presumed the court will redress the wrong." Or again: "The court will correct the wrong—will quash the indictment or the panel— or, if not, the error will be corrected in a superior court."

The reason why a discrimination by legislative action is held to be a denial is, as likewise stated, this:

"When a statute of the state denies his right, or interposes a bar to his enforcing it in the judicial tribunals, the presumption is fair that they will be controlled by it in their decisions."

The one discrimination is not a denial, therefore, because it will not affect the judicial tribunals of the state prejudicially to the defendant. The other discrimination is a denial, because it will so affect said tribunals. It will not affect them absolutely or certainly. It may not affect them at all. Indeed, it is their duty not to be affected by it. Article 6 of the federal Constitution requires that they should not be affected by it. But they may be, and the presumption is to be indulged that they will be, notwithstanding that in a habeas corpus case, under sections 751–755, as to one claiming to be in custody in violation of the Constitution, the contrary presumption is indulged in. Does it not follow from this that any other state action involving an illegal discrimination which will in a real sense affect the judicial tribunals of the state—in as real a sense as legislative action will—is within the meaning of section 641? I think it is. We reach the same conclusion if we consider the purpose of the section, the end it was intended to accomplish, its spirit which has been congealed in the words of the statute, and from that lofty height view and construe the language. What was that purpose or end? Was it not to secure in the state judicial tribunals a free and full exercise and enjoyment of the equal protection of the laws, as full and free as ought to be obtained or can be obtained in the federal tribunals, and was it not intended to provide that, if a defendant in a prosecution pending there could not obtain such exercise and enjoyment of such protection in those tribunals—if there was any real hindrance or obstacle to obtaining them there—then he should have the right to have the prosecution removed to the federal court? It seems to me that it was. These two considerations lead to the conclusion that the denial referred to, and within the meaning of the statute, was not primarily a denial that had its place in the judicial tribunals of the state, but a denial that in a real sense would have an effect there, without any limit as to where it took place, provided it would have an effect there. If so, then prior judicial action either outside of or within the particular prosecution which would affect the state court having to do with said prosecution, in affording this defendant therein the equal protection of the laws in its further handling of the prosecution, was within the meaning of the statute. As, for instance, suppose the Court of Appeals, though reversing the judgments against him on the various grounds stated, had held that it had jurisdiction to consider the question as to the illegal discrimination complained of, and that the defendant had no right to be free from such discrimination, would that not have made a clear case of a denial to the defendant of the equal protection of the laws, and authorized a removal under section 641? Such judicial action would have affected the lower court in its further handling of the case in just as real a sense as an unconstitutional statute providing for the discrimination. There

would seem to be no question as to this, and that such a case would be clearly within section 641.

· The position that what amounts to a denial of the equal protection of the laws by judicial action prior to the filing of the petition for removal may be within section 641 is strengthened by two considerations. One is that the denial called for by said section is not limited in its words to a denial by legislative action. There is not a word said about legislative action in the section. The other is that the section authorizes a petition for removal to be filed after judicial action has been had not only outside of the prosecution, but within it. The time fixed for filing it is "at any time before the trial or final hearing of the cause." In the case of Ayers v. Watson, 113 U. S. 594, 5 Sup. Ct. 641, 28 L. Ed. 1093, Justice Bradley said, "This language has been held to apply to the last and final hearing." To the same effect, see Home Life Ins. Co. v. Dunn, 86 U. S. 214, 24 L. Ed. 68; Vannever v. Bryant, 88 U. S. 41, 22 L. Ed. 476; Jifkins v. Sweetser, 102 U. S. 177, 26 L. Ed. 129; B. & O. R. Co. v. Bates, 119 U. S. 464, 7 Sup. Ct. 285, 30 L. Ed. 436; Fisk v. Henarie, 142 U. S. 459, 12 Sup. Ct. 207, 35 L. Ed. 1080; City of Detroit v. Detroit City Ry. Co. (C. C.) 54 Fed. 10.

In Bush v. Kentucky, supra, the case was removed from the state court on the first application after a reversal by the Court of Appeals of a judgment in the trial court; and in Davis v. So. Carolina, 107 U. S. 597, 2 Sup. Ct. 636, 27 L. Ed. 574, a removal was had under section 643, which has the same language as 641 as to time after a trial and verdict and a new trial granted. The statute therefore contemplated a removal after several trials, and the case had gone to the Court of Appeals several times, as here, and therefore after judicial action had in the prosecution that might affect the last and final trial.

Besides all this, the cases in which the Supreme Court has had to · do with the construction of section 641 are not without intimation that judicial action prior to the filing of the petition for removal might make a case for removal. In the case of Virginia v. Rives, in holding that a case for removal had not been made on the ground that before the filing of the petition the state court had refused to provide the defendant with a mixed jury—the only case that has arisen in which judicial action prior to the filing of the petition has been made a ground of removal—the Supreme Court did not base its ruling upon the ground that prior judicial action could not be made a cause for removal, but on the ground that the prior judicial action complained of therein was not a denial of the equal protection of the laws, inasmuch as a mixed jury was not an element of such protection; and it seems to be implied that prior judicial action that was a denial thereof might be made a cause for removal. And in the case of Neal v. Delaware, Justice Harlan expressly said as follows:

"Had the state, since the adoption of the fourteenth amendment, passed any statute in conflict with its provisions, or with the laws enacted for their enforcement, or had its judicial tribunals, by their decisions, repudiated that

amendment as a part of the supreme law of the land, or declared the acts passed to enforce its provisions to be inoperative and void, there would have been just ground to hold that there was such a denial upon its part of equal civil rights, or such an inability to enforce them in the judicial tribunals of the state, as, under the Constitution, and within the meaning of section 641, would authorize a removal of the suit or prosecution to the Circuit Court of the United States."

This language is repeated in one of the subsequent cases.

Again, in Bush v. Kentucky it was held that a statute illegally discriminating against negroes, passed after the fourteenth amendment, which, nothing else appearing, would have amounted to a denial in the judicial tribunals of the state, under Strauder v. West Virginia, did not amount thereto in that case, because prior to the filing of the petition for removal the Court of Appeals had held the statute unconstitutional. If, then, a denial could be removed by judicial action, could it not as well be created thereby?

The commonwealth's contention really comes down to a question of tenses. Its position amounts to this: A defendant in a prosecution in a state court, who has been denied therein the equal protection of the laws prior to the filing of a petition for removal, is not entitled to a removal, because the denial is a past denial, and not a present one. The position is fallacious, in that it assumes that such a past denial may not be a present one. Though past in being made, if never set aside it is present in force and effect.

Conceding, then, that it is possible for judicial action in a prosecution in a state court prior to the filing of the petition for removal to make a case for removal, is the prior action of the Scott circuit court at the second and third trials of defendant, in holding that he had no right to be exempt from the discrimination complained of, and in thus denying him the equal protection of the laws, sufficient to entitle defendant to a removal? It all depends upon whether such action is a hindrance or obstacle, in a real sense, to a free and full exercise and enjoyment of such right at another trial in said court— just as much so as an unconstitutional statute which said court should disregard and refuse to follow would be. Though the judgments of conviction in said court have been reversed, they have not been reversed on the ground of such action, but on other grounds. The Court of Appeals has held that it had no jurisdiction to consider or question said action, and has declined to do so. The Scott circuit court is the highest court in the state that had or has a right to deal with that question. It has on two occasions held that the defendant had not the right which he claims, and has entered upon its records that the defendant is not entitled thereto, and that entry has never been expunged or set aside. It remains there to-day. It must be conceded that this action and this entry will have an influence upon the future action of the court in this particular. The granting to defendant of the right asserted by him at another trial will be a change of front on the part of the court. To grant it, it will have to reverse its former action.

It cannot be urged that said prior action of the Scott circuit

court, denying the defendant the right he claims, is not a real hindrance and obstacle in the way of the future assertion of that right in said court, because there is now a new judge on the bench. A change of judges in the past has not effected a change in action with reference to defendant's right. Indeed, such a change, instead of being a reason for expecting a change in such action, may be regarded as a reason for not expecting it, on the ground of comity. In courts of original jurisdiction, comity, as a rule, at least, requires that the successor of another judge in a case shall adhere to the latter's former rulings therein.

It is to be noted, though it is probably without legal significance, that it is reasonable to conclude that the Court of Appeals, as constituted at the time the petition for removal was filed, was adverse to defendant's said right. The majority thereof consisted of the former judge of the Scott circuit court, who presided at the first two trials, and the minority, who dissented from the judgment of reversal at the last hearing in the appellate court. The basis of the inference as to the said minority consists in the expression of regret in the opinion delivered on its behalf that the case was to be reversed. It is hard to conceive how such a feeling could exist if it was really believed that the defendant had the right in question, the record showing clearly that it had been denied him. This inference is enforced by the further fact that in the opinion delivered on behalf of the minority on the second hearing, when amongst the errors complained of was the denial of said right, it was stated that "outside of the refusal of the circuit judge to vacate the bench all the errors complained of may justly be compared to fly-specks on the surface of the shell of a hen's egg," and, further, that "the circuit judge presided at the trial with rare ability and entire impartiality."

I, therefore, conclude that the prior action of the Scott circuit court denying the defendant the equal protection of the laws is a real hindrance and obstacle to his asserting his right thereto in a future trial therein—just as real as an unconstitutional statute would be—and that the defendant is denied the equal protection of the laws in said court, within the meaning of said section, and entitled to a removal on account thereof. He is denied in said court the equal protection of the laws because he has been denied, and such denial has never been set aside, but remains in full force and effect.

But thus far we have only dealt with one half of the statute. It remains to consider briefly the other half thereof. It is claimed in the petition for removal that defendant cannot enforce his right to the equal protection of the laws in the judicial tribunals of the state, and because of this he is entitled to a removal. By an "inability to enforce in the judicial tribunals of the state" is meant, as I construe the statute, any judicial tribunal of the state that may have jurisdiction of the prosecution. It was intended thereby to provide that, if a defendant in a criminal prosecution pending in a state tribunal cannot enforce his right to the equal protection of the laws in such court, or in any court to which it may be carried, then he is entitled to a removal. In this case the Court of Appeals of

Kentucky has jurisdiction of the prosecution against defendant. It can be carried there on appeal from the circuit court, but defendant cannot enforce therein his right to the equal protection of the laws, if denied in the circuit court, at a future trial; and this is, by virtue of legislative action, embodied in section 281 of the Kentucky Criminal Code of Practice, heretofore quoted, as construed by the Court of Appeals. The only answer that is made to this is that, if defendant is entitled to a removal because of this inability to enforce said right, every defendant in a criminal prosecution instituted in a circuit court in this state will be entitled to a removal. This, however, does not follow. It only follows that every defendant who has been prejudiced by the inability to enforce, as defendant has been, is entitled to a removal. In the case of Com. v. Wright, 79 Ky. 22, 42 Am. Rep. 203, the question was up whether a white person indicted by a grand jury composed wholly of persons of the white race could complain because negroes were excluded from the jury by which he was indicted, under the statute of Kentucky excluding them therefrom. It was held that he could not. Chief Justice Cofer said, "Only those who are prejudiced by an unconstitutional law can complain of it." Likewise I would hold that only persons who may be prejudiced by the statute making it so that a defendant in a criminal prosecution cannot enforce his right to the equal protection of the laws in the Court of Appeals of this state can have a removal to the federal court because of such inability.

The conclusion I have reached, therefore, is that this case comes within both halves of the statute. It is no answer to defendant's right to the removal sought that he could have had the denial of his right to the equal protection of the laws corrected by the Supreme Court of the United States on error thereto, had either of the last two judgments against him been affirmed by the Court of Appeals, or that he can obtain such correction if there is a similar denial in the future, and a judgment of conviction against him is allowed to stand. Notwithstanding this remedy, he is entitled to the remedy of removal, if the case comes within the statute. Congress has seen fit to provide him with this remedy, and all that is essential to entitle him to it is that his case shall come within the terms of the statute, and that I have found to be the case.

But to say the very least, it is not certain that defendant can correct the denial complained of, if repeated at another trial; and, so far as my research has gone, I have been unable to find a decision of the Supreme Court of the United States which would authorize a writ of error in this sort of a case. If entitled to such writ, it must be to re-examine either the judgment of the Scott circuit court, or the judgment of the Court of Appeals affirming that judgment. It is difficult to see how it could, in any state of the case, be to re-examine the judgment of the Scott circuit court, either before or after a judgment of affirmance by the Court of Appeals. Section 709, Rev. St. U. S. [U. S. Comp. St. 1901, p. 575], relating to writs of error as to judgments and decrees of state courts, expressly provides that

the judgment or decree of a state court, which the Supreme Court may re-examine and reverse or affirm upon writ of error, is the "final judgment or decree in the highest court of a state in which a decision in the suit could be had." The Scott circuit court is not the highest court of the state in which a decision in the prosecution against the defendant can be had. The Court of Appeals is that court. An extreme application of this requirement is the case of Great Western Tel. Co. v. Burnham, 162 U. S. 342, 16 Sup. Ct. 850, 40 L. Ed. 991. There a circuit court of Wisconsin had overruled a demurrer to the petition. The appellate practice of that state authorized an appeal to the Supreme Court from such an order, and an appeal was taken therefrom. It was held that the demurrer should have been sustained, the order was reversed, and the cause was remanded to the circuit court for further proceedings according to law. The lower court thereupon sustained the demurrer and dismissed the petition. It was held that the judgment of the circuit court was not subject to a writ of error; that an appeal should have been taken to the Supreme Court of the state, notwithstanding it was bound by its former ruling, and would affirm the case as a matter of course, and upon its doing so the judgment of affirmance should have been made the subject of the writ. The following cases on error from Massachusetts, to wit: McGuire v. Com., 3 Wall. 382, 18 L. Ed. 164; McDonald v. Massachusetts, 180 U. S. 311, 21 Sup. Ct. 389, 45 L. Ed. 542; Rothschild v. Knight, 184 U. S. 334, 22 Sup. Ct. 391, 46 L. Ed. 573—in which it is held that the judgment of the superior court of Massachusetts, and not that of the Supreme Court, is the subject of the writ of error—should be distinguished. This was because the superior court of that state is the highest court in which a final judgment or decree in such a suit can be had; the Supreme Court simply passing on exceptions, and certifying its ruling to the superior court. Likewise this case on error from New York, to wit, Green v. Van Buskirk, 3 Wall. 448, 18 L. Ed. 245, in which it was held that on affirmance by the Court of Appeals of that state of a judgment of the Supreme Court thereof, and sending the record to the Supreme Court with directions to enter judgment, which was accordingly done, a writ of error might be taken to the latter court, should be distinguished. This was because a writ of error may be taken to either court where the judgment of the highest court may be found. On such writ of error, however, it is the judgment of the highest court of the state, and not that of the lower court, which is re-examined. Justice Story, in Gelston v. Hoyt, 3 Wheat. 304, 4 L. Ed. 381, said as follows:

"It must be directed either to that tribunal which can execute it, to that in which the record and judgment to be examined are deposited, or to that whose judgment is to be examined, although, from its structure, it may have been rendered incapable of performing the act required by the writ. Since the law requires a thing to be done, and gives the writ of error as the means by which it is to be done, without prescribing in this particular the manner in which the writ is to be used, it appears to the court to be perfectly clear that the writ must be so used as to effect the object. It may then be directed

to either court in which the record and judgment on which it is to act may be found. The judgment to be examined must be that of the highest court of the state having cognizance of the case, but the record of that judgment may be brought from any court in which it may be legally deposited, and in which it may be found by the writ."

As distinguishing the Massachusetts and New York cases, see Atherton v. Fowler, 91 U. S. 143, 23 L. Ed. 265; Crane Iron Co. v. Hoagland, 105 U. S. 701, 26 L. Ed. 1109.

So it is that it has always been the practice in taking cases to the Supreme Court of the United States from Kentucky, after the affirmance of a judgment of the circuit court by the Court of Appeals, to take the writ of error from the Court of Appeals. The following cases were so taken, to wit: Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115; Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649; Cov. & Cin. E. R. & T. B. Co. v. Kentucky, 154 U. S. 224, 14 Sup. Ct. 1094, 38 L. Ed. 970; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup. Ct. 532, 41 L. Ed. 953; Chesapeake & Ohio R. Co. v. Kentucky, 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244. If, then, defendant would be entitled to a writ of error at all in case of a future denial, it could only be taken from the judgment of the Court of Appeals affirming the judgment of the Scott circuit court, to re-examine said judgment of affirmance. It is difficult to see how it could lie to said judgment, because it would not be against any federal right of the defendant. The Legislature has provided that the Court of Appeals of Kentucky shall not have jurisdiction to review challenges to the juries in criminal prosecutions for any cause whatsoever, and that the action of the circuit court is final in regard thereto. At least, the Court of Appeals has so construed section 281, and that construction is binding on this court. It was not bound to provide that any appeal might be taken from a judgment of the circuit court in a criminal case. It might have made the judgment of the circuit court final. An appeal, therefore, being a matter of grace, and not of right, it could be granted on such terms as the Legislature saw fit. Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989; Andrews v. Swartz, 156 U. S. 272, 15 Sup. Ct. 389, 39 L. Ed. 422; Kohl v. Lehlback, 160 U. S. 293, 16 Sup. Ct. 304, 40 L. Ed. 432; Mallett v. North Carolina, 181 U. S. 589, 21 Sup. Ct. 730, 45 L. Ed. 1015. In this state the Legislature has seen fit to grant an appeal, but has provided that, on an appeal, rulings of the lower court as to challenges to the jury, as to motions to set aside the indictment, and as to motions for new trial cannot be considered by the Court of Appeals. This it had a right to do. It seems to me, therefore, that the Court of Appeals was correct in its ruling heretofore declining to pass on the federal question raised by defendant in regard to the selection of the jurors from which came the juries that tried him. It has not denied him the equal protection of the laws, because it had no jurisdiction to pass on the question. And here I feel constrained to differ from Judge Barker's position in his separate opinion the last hearing. He based his opinion that the Court of Appeals had jurisdiction of the federal question

on article 6 of the federal Constitution, which provides that the Constitution and laws of the United States shall be the supreme law of the land, and that the judges in every state shall be bound thereby. But this article of the federal Constitution does not undertake to confer jurisdiction on state judges or courts. It simply provides that state judges and courts, in disposing of matters of which they have jurisdiction, shall be bound by the federal Constitution and laws, and nothing more. If, then, the Court of Appeals has no jurisdiction of the federal question involved here, and it declines to pass upon it, how can a writ of error be taken to its judgment? It has passed on no federal question adversely to defendant. In the case of Great Western Tel. Co. v. Burnham, supra, Justice Gray said:

"This court has no jurisdiction upon writ of error to review a judgment of a state court, unless it was a final judgment by the highest court of the state in which a decision in the suit could be had, and against a right set up under the Constitution and laws of the United States."

In Gelston v. Hoyt, supra, Justice Story said:

"The judgment to be examined must be that of the highest court of the state having cognizance of the case."

And in Fashnacht v. Frank, 23 Wall. 416, 23 L. Ed. 81, Chief Justice Waite said:

"We act only upon the judgment of the Supreme Court. Only such questions as either have been or ought to have been passed upon by that court in the regular course of its proceedings can be considered by us upon error."

In the cases cited above which went to the Supreme Court of the United States on error from Kentucky, in which a reversal was had, to wit, the Crutcher and Cov. & Cin. E. R. & T. B. Co. Cases, the judgments of the Supreme Court were that the judgments of the Court of Appeals of Kentucky be reversed; not a word being said about the judgments of the circuit court which had thereby been affirmed.

What makes me hesitate to take the position that no writ of error would lie to the Supreme Court in the case under consideration is that it is hard to conceive of its being possible that there should be a case where a denial by a state court of a federal right could not be carried on error to the Supreme Court. To prevent such a casus omissus, one would be justified in straining the language of section 709 to the utmost limit, and it is evident that it would not be favored by the Supreme Court. In the case of Luxton v. North River Bridge Co., 147 U. S. 337, 13 Sup. Ct. 356, 37 L. Ed. 194, it was held that a writ of error would not lie to the Circuit Court of the United States for the District of New Jersey to reverse an order appointing commissioners to assess damages in a condemnation proceeding, because such an order was not final. In the prior case of Wheeling & B. Bridge Co. v. Wheeling Bridge Co., 138 U. S. 287, 11 Sup. Ct. 301, 34 L. Ed. 967, it was held that a writ of error would lie to the Supreme Court of West Virginia, affirming the order of a

lower court appointing commissioners for such purpose in such a proceeding. In distinguishing this case from the later case, Justice Gray said that the former was accounted for by the fact that the Supreme Court of West Virginia had held that the order of the lower court was a final order, from which error lay to it, and said:

"To have held otherwise might have wholly defeated the appellate jurisdiction of this court under the Constitution and laws of the United States, for, if the highest court of the state held the order appointing commissioners to be final and conclusive unless appealed from, and the validity of the condemnation not to be open on a subsequent appeal from the award of damages, it is difficult to see how this court could have reached the question of validity of the condemnation, except by writ of error to the order appointing commissioners."

And in the case of Great Western Tel. Co. v. Burnham, supra, in response to the position of plaintiff in error that a writ of error to the circuit court was the only way in which the federal question involved in the case could be reviewed, Justice Gray said, "If all this were so, there would be strong ground for sustaining the present writ of error."

I am not unmindful of the fact that in Bush v. Kentucky, supra, the Supreme Court of the United States reversed the judgment of the Court of Appeals because it affirmed a judgment of the circuit court, which had overruled a motion to set aside an indictment found when the discriminatory statute of Kentucky had not been declared unconstitutional, when it should have sustained the motion, and that a Code provision similar to section 281 was then in force. But no attention seems to have been called to the existence of this Code provision, or as to its having any bearing upon the question. So far as the opinion of that case shows, the Court of Appeals considered and passed on the question. At least, there is nothing showing that it did not.

If, then, no writ of error would lie to the Supreme Court in case defendant should hereafter be denied the equal protection of the laws, all the more reason for holding that this case comes within section 641. In that event the alternative remedies would be either a removal under section 641, or, if convicted, a release from said state custody, and from further prosecution for the offense in any court, upon writ of habeas corpus, under sections 751–755. The latter is the more delicate remedy of the two, and of the two the former is to be preferred. If, however, it cannot be said certainly that a writ of error will not lie, only that it is uncertain whether it will lie, and that it will take the Supreme Court to determine the question, then it will hardly be right to let go a remedy for a wrong that is practically conceded, on the idea that another remedy exists therefor, until it has been settled beyond question that the other remedy exists. For if I shall decide that the remedy of removal under section 641 does not exist, and hence overrule the motion, it would be a letting go of that remedy. This action would have to be followed by an order remanding the cause to the state court, and no appeal or writ of error could be taken therefrom, nor could I be

compelled to take jurisdiction by mandamus. It was so decided by the Seventh Circuit Court of Appeals in Cole v. Garland, 107 Fed. 759, 46 C. C. A. 626. On the other hand, if I decide to take jurisdiction, my action is not final. Application can be made to the Supreme Court for a mandamus commanding me to restore defendant to state custody, as was done in Virginia v. Rives, and the whole question as to defendant's remedies can be settled for all time to come. That the fact that the grave questions which I have considered herein cannot be carried further if I decide against defendant, and that they can be carried further if I decide in his favor, should have something to do with controlling my action, and just what it should have to do therewith, is well stated by Judge Sanborn in the recent case of Boatmen's Bank v. Fritzlen (C. C. A.) 135 Fed. 655. He there said:

"Every conscientious judge, every thoughtful man, upon whom is laid the grave responsibility and the heavy burden of determining the rights of his fellows, rejoices in the thought, wherever such is the case, that his decision may be reviewed, and that, if erroneous, it will not work irreparable injustice to him whom he deems it his duty to defeat. When a case has been removed from a state to a federal court, and a motion to remand is made, or when a motion to remove is presented in the first instance to the federal court, the petitioner either has or he has not the right to the trial and decision of his controversy in that court. That right is of sufficient value and gravity to be guarantied by the Constitution and acts of Congress. If it exists, and the circuit court denies its existence, and remands or refuses to remove the suit, the error is remediless, and it deprives the petitioner of his constitutional right. If the right does not exist, and the court affirms its existence and retains the suit, any error may be corrected by the Supreme Court. An error that the aggrieved party may correct is less grievous than one that is without remedy. And the true rule is that motions to remand and for removal should be decided, not by existence of doubts, but by the preponderance of the facts, the law, and the reasons which condition them, in view of the fact that the right to invoke the jurisdiction of the federal court is a valuable constitutional right, and an erroneous affirmance of the claim of that right may be corrected by the Supreme Court upon a certificate of the question of jurisdiction, while an erroneous denial of the claim is remediless."

It remains to say a word or two in conclusion in regard to the first paragraph of the petition, in which it is claimed that defendant is entitled to a removal because the state courts have denied the validity of the pardon issued by Taylor. In order for that to be a good ground for removal, it is necessary, in addition to such denial, that defendant had a right to be released from custody because of such pardon, and, further, that the right to such release was secured to him by the fourteenth amendment. As to the right to be released from custody because of said pardon, I do not think that I have the right to pass upon the question on its merits. The question as to who was Governor of Kentucky de jure and de facto on the 10th of March, 1900, and as to the validity of said pardon, is a local one, and it has been determined by the Court of Appeals that J W. C. Beckham was Governor of Kentucky, both de jure and de facto, on said date, and that said pardon is invalid, and I think I am concluded by that determination. Furthermore, even if said right existed, I do not think that it is one secured to the defendant by the

equal protection of the laws clause of the fourteenth amendment. If it is, then every right one has is so secured, and every decision by the state courts against such a right would present a federal question and a ground for removal. This certainly cannot be the case.

My conclusion, therefore, is that, by virtue of the second paragraph of the petition, the removal proceedings have worked a transfer of jurisdiction. It seems to me that it would be hard to get a case that more certainly comes within section 641. The defendant has been and is denied the equal protection of the laws in the Scott circuit court, and he cannot enforce his right thereto in the Court of Appeals.

Since writing the foregoing I have stationed myself away from it, and looked at it to see what possible flaw I could detect in its reasoning. So far as my mental vision goes, I am unable to detect any; but another position than those urged by counsel for the commonwealth occurs to me for claiming that this case does not come within section 641, and I think I ought to refer to it. The positions which said counsel have urged are two, one relating to each half of the statute. That relating to the first half is that a judicial denial is not, and only a legislative denial is, within said section; and that relating to the second half is that, if defendant can claim a removal because of section 281 of the Kentucky Criminal Code of Practice, then every person against whom a criminal prosecution is instituted in this state can likewise claim a removal. These are the only positions which they have put forward or relied on. The additional position that has so occurred to me is that I am wrong in assuming that the equal protection of the laws clause of the fourteenth amendment is a law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, in the meaning of section 641; that the law had in view thereby is a statute so providing; that the only statute which it could have had in view is section 1977, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1259], which provides that "all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other," and that this section is limited in the benefits which it confers to negroes and other colored persons, and that white persons have acquired no rights thereunder. The effect of this position is to limit the right of removal provided by section 641 to negroes and other colored persons, and exclude white persons therefrom. In support of the proposition that said section had in view a statute only, and that statute section 1977, reference may be made to Justice Strong's statement in Strauder v. West Virginia, that section 641 "plainly has reference" to said section 1977.

But to say that it has reference thereto is not the same as to say that it is limited thereto. And the equal protection of the laws clause is a law providing for the equal civil rights of all persons within the jurisdiction of the United States, in that by reason of it all such persons have such rights. It is a part of the organic law of the federal government to that effect. The position, if not vulnerable here, is so at another point. Section 1977, so far as it confers rights, is not limited to negroes and colored persons. It confers rights on white persons. The persons on whom it confers rights are "all persons within the jurisdiction of the United States." It is only when it comes to define the rights which the section confers that they are referred to as such "as is enjoyed by white citizens." Concerning this section, Justice Strong said: "This act puts in the form of a statute what has been substantially ordained by the constitutional amendment. It was a step towards enforcing the constitutional provision." And he refers to section 641, in relation to said section, as "an advance step." According to this, section 1977 is as broad as the fourteenth amendment as to the persons affected by it; and it is well settled now, however it may have been earlier, that said amendment relates to all persons, without reference to color. If, indeed, section 641 was intended to be limited to negroes or other persons of color, it is difficult to understand why it did not so provide, instead of conferring the right of removal upon "any person who is denied or cannot enforce," etc.

The motion for the writ is sustained.